## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ANN DORMANI, MITCHELL W. KNOLL, DAVID RIGOL, and DOROTHEA SIMMONS, on behalf of the Target Corporation 401(k) Plan, themselves, and a class consisting of similarly situated participants of the Plan, | Case No. |
| | |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| TARGET CORPORATION, SCOTT KENNEDY, MICHAEL FIDDELKE, PLAN INVESTMENT COMMITTEE, JOHN MULLIGAN, COREY HAALAND, JODEE KOZLAK, BETH JACOB, JOHN DOE DEFENDANTS 1-10, and GREGG STEINHAFEL, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

1.      Plaintiffs Ann Dormani, Mitchell W. Knoll, David Rigol, and Dorothea Simmons ("Plaintiffs"), individually, as representatives of the Class described herein and defined below, and on behalf of the Target Corporation 401(k) Plan (the "Plan"),[1] bring this action against the below-named defendants (collectively "Defendants") pursuant to

---

[1] The Plan is defined to include the Target Corporation Ventures 401(k) Plan, which was spun off from, and then reabsorbed into the Plan.

§§ 404, 405, 409, and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109, and 1132.[2]

2.      The Plan is a defined contribution plan sponsored by Target. The purpose of the Plan is to encourage employees to save for their retirement, and the Plan's purpose is a paramount consideration in administering and managing the Plan. The Plan provides for an individual account for each participant, and plan benefits are based solely on the amount contributed to the participant's account, and any income, expenses, gains and losses. Funds in each Participant's account are allocated among available investment options that were selected by Defendants in Defendants' fiduciary capacities.

3.      One of the investment options offered by Defendants to Participants during the Class Period (February 27, 2013, to August 6, 2014, inclusive) was the Company Stock Fund (the "Fund"), a unitized common stock of Target ("Target Stock" or "Company Stock"). The Fund was valued using unit-based accounting and invested virtually all of its assets in Target Corporation common stock, with a small cash reserve held to accommodate withdrawal requests, despite disclosures that only required the Fund to primarily hold Target Stock. Participants owned units of the Fund which consisted of cash and Target Stock in the same proportion as the Fund's holding of cash and Target Stock.  When Participants contributed to the Fund, they purchased units of the Fund, not

---

[2] All allegations contained herein are based upon personal information as to Plaintiffs and the investigation of Plaintiffs' counsel.  In particular, Plaintiffs through their counsel, have reviewed, among other things, documents filed with the U.S. Department of Labor (the "DOL") and the United States Securities and Exchange Commission (the "SEC"), other lawsuits against Target Corporation ("Target" or the "Company"), and public statements and media reports; and had discussions with participants and beneficiaries (the "Participants") of the Plan.

shares of Target Stock.  Similarly, the Plan did not purchase or sell shares of Target Stock, the Fund bought and sold shares of Target Stock, and the Plan bought and sold units of the Fund.

4.      In February 2013, at the beginning of the Class Period, the Fund comprised over $2 billion of the approximate $4.19 billion in total assets held by the Plan, or almost half of the Plan's net assets, and to compound the problems alleged herein the Plan acquired hundreds of millions of dollars of Target Stock while Target Stock was artificially inflated. Therefore, Participants' retirement benefits were dependent largely on the performance of Target Stock, which was artificially inflated and the price of which was bound to fall to its fair value upon the inevitable disclosure of the same.

5.      The public revelation of the Company's problems in Canada and elimination of Target Stock's artificial inflation was inevitable. Thus, Defendants did not have a choice between the harm of disclosure and the possibility of avoiding that harm; instead they had the choice between a swifter and milder disclosure without wasting Plan assets in the interim, or wasting Plan assets by investing tens of millions of dollars in artificially inflated Target Stock to moderately delay an inevitable drop in price of the Plan's holdings. Wasting significant assets to temporarily delay an inevitable drop in large holdings is more harmful than helpful to the Plan.

6.      ERISA's duty of prudence required that Defendants execute a robust process to ensure an adequate and ongoing evaluation of the suitability of the Fund as an unrestricted investment option to the Plan. A decision-making process carefully balancing the magnitude of the investment with the risks thereof, and taking steps to

ensure investments in the Plan were prudent, was imperative. No such process was in place for the Fund, as opposed to the Plan's other investment options, between January 1, 2014, and April 30, 2014 (before complete disclosure of Target Canada's problems was made), and the Plan's holdings of Target Stock depreciated by over $50 million in the first four months of 2014. As the Plan's assets dwindled, Defendants should have been particularly attuned to the Fund and considered its prudence.

7.     Instead, as discussed in greater detail below, Defendants, who had access to nonpublic information relating to Target's operations, permitted the Plan to continue to offer Target Stock as an investment option even after the Defendants knew or should have known that Target Stock was artificially inflated during the Class Period. Due to the artificial inflation of the Company Stock price—which would be corrected during the time that negative information became revealed—Target Stock was an imprudent retirement investment for the Plan given its purpose of helping Plan Participants save for retirement. As fiduciaries of the Plan, Defendants were empowered to take measures to help Participants, but failed to take any action to protect the interests of the Plan or its Participants. Thus, Defendants breached their obligations under ERISA and are liable for the damages to the Plan, Plaintiffs and other Participants.

8.     This case is brought to remedy Defendants' breaches of ERISA-imposed fiduciary duties. ERISA obligated Defendants to protect the Plan and Participants' interests.[3]   Specifically, Defendants breached their fiduciary duties by, among other

---

[3] As the Plan's Summary Plan Description ("SPD") advised Participants, "[i]n addition to creating rights for Plan participants, ERISA imposes duties upon the people who are

things, retaining Target Stock as an investment option in the Plan when a reasonable fiduciary using the "care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use" would have done otherwise. *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

9.     Defendants were tasked with the responsibility of managing the multi-billion-dollar Fund which was the Plan's largest holding and represented a substantial portion of the Plan's assets. Defendants breached their ERISA fiduciary duties of prudence and loyalty to the Plan, Plaintiffs, and other Participants by continuing to offer, hold, and acquire shares of Target Stock in the Fund when Target Stock was an imprudent investment for Participants because Defendants knew, or would have known of the non-disclosed information had they exercised appropriate procedural prudence.

10.     Instead of Defendants considering the Fund's prudence during the almost fifteen-month Class Period, based upon its minutes, the Plan Investment Committee (the "PIC" or "Committee") met three times and conducted a cursory discussion of the Plan twice, reviewing the same basic data and not considering the prudence of any particular investment option other than a hindsight review of how, in terms of change in stock price, it had performed. The Committee and its members ignored what they knew or should have known about Target, and simply did not discuss the same at any of their meetings other than an annual review which, while more detailed, also ignored the Fund's

---

responsible for the operation of the Plan.  The people who operate your Plan, called 'fiduciaries' of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries."

prudence.[4]   Rather than reviewing the data presented or otherwise available to them, which would have compelled the conclusion that fiduciary action would not do more harm than good to the Fund as shown below, Defendants, in their fiduciary capacity, ignored the artificial inflation in Target Stock and continued to allow the Plan to waste assets by purchasing artificially inflated Target Stock in violation of ERISA and trust law.

11.    Thus, in violation of their fiduciary duties under ERISA, Defendants did not adequately consider, evaluate, and/or disclose information pertinent to the value of Target Stock in light of the serious problems with Target Canada discussed below, despite the fact that Defendants participated in, knew, or should have known of each of the undisclosed risks involved in investing in Target Stock as a result of their respective senior positions in Target and their specific job-related responsibilities.

---

[4] The PIC met on June 26, 2013, and performed the "TGT 401(k) Annual Review."  The minutes state that "Jeff Bailey and AI Ezban provided an annual review of the Target 401 (k) Plan participation, fund performance and investment option usage.  This review included discussion of the 'glidepath' and performance of the LifePath funds (Exhibit D) in light of recent SEC guidance around 'Target Date Funds.'" This annual review was scheduled to last 90 minutes, and was the last substantive review related to the Plan that the PIC preformed during the Class Period.  It appears that this annual review considered data from March 31, 2013.

Based upon documents produced to Plaintiffs, the PIC only met two other times during the Class Period.  The PIC met on October 28, 2013, but that meeting does not appear to have involved the Plan in any way.  It focused entirely on de-risking the defined benefit pension plan for which Target bore risk.  The PIC met again on April 17, 2014, and focused mostly on de-risking the defined benefit pension plan for which Target bore risk. From the minutes, it appears that the PIC only reviewed boiler plate slides with respect to Plan data.  Indeed, based upon the agenda it appears the PIC spent fifteen minutes discussing and/or reviewing a performance review, less than one third the slides of which relate to the Plan.  There was no consideration of the appropriateness of Target Stock as a retirement investment vehicle.

12.    Despite that they knew or should have known that the value of the Target Stock was artificially inflated, Defendants failed to: (1) prudently and loyally manage the Fund; (2) monitor other Plan fiduciaries and provide them with complete and accurate information; and (3) evaluate, consider and take alternative lawful actions that could have mitigated or avoided the loss of hundreds of millions of dollars of retirement assets suffered by the Plan and the Participants. Instead of protecting the Plan and acting solely in the interests of the Plan and its Participants, Defendants found themselves conflicted and making imprudent decisions designed to maintain or inflate the value of the Target Stock rather than to maximize the Plan's assets.

13.    The Supreme Court has explained that an ERISA fiduciary's perpetuation of an imprudent investment violates his obligations under ERISA. In *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014), the Court considered a class action in which participants in an ERISA plan challenged the plan fiduciaries' failure to remove company stock as a plan investment option. The Supreme Court held that retirement plan fiduciaries are required by ERISA to determine independently whether company stock remains a prudent investment option. Moreover, the Supreme Court rejected the defendant-fiduciaries' argument that they were entitled to a fiduciary-friendly "presumption of prudence," holding that "no such presumption applies," *Fifth Third*, 134 S. Ct. at 2463, and further held "that the duty of prudence ***trumps*** the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary." *Id.* at 2468 (citation omitted) (emphasis added). Likewise, the Plan's "fiduciaries are subject to the same duty of prudence that applies to

ERISA fiduciaries in general." *Id*. at 2463 (emphasis added). Thus, even if the Plan purportedly required Target Stock be offered, the Plan's fiduciaries were obligated to disregard that directive once Company Stock was no longer a prudent investment for the Plan.

14.    Although Defendants knew that Target Stock was artificially inflated during the Class Period, they nonetheless allowed and authorized the Plan to purchase hundreds of millions of dollars worth of Target Stock. During the Class Period, the Company made a series of reassuring statements about Target's new Canadian stores and operations ("Target Canada"). These statements were materially false and misleading and/or omitted to disclose: (a) at the time of the opening of its first group of stores in Canada, Target had significant problems with its supply chain infrastructure, distribution centers, and technology systems, as well as inadequately trained employees; (b) these problems caused significant, pervasive issues, including excess inventory at distribution centers and inadequate inventory at retail locations; (c) this excess inventory at distribution centers and lack of inventory at retail locations forced Target to heavily discount products and incur significant losses; and (d) these supply-chain and personnel problems were not typical of newly launched locations in Target's traditional U.S.-based market.   To the extent Target made disclosures about these issues, it suggested the problems with Target Canada were reparable with modest tweaks when, in fact, a post-mortem showed that Target was "unable to find a ***realistic*** scenario that would get Target Canada to profitability until at least 2021." (emphasis added).

15.     Given the totality of circumstances prevailing during the Class Period, no prudent fiduciary could have made the same decision as Defendants to retain and continue purchasing the clearly imprudent Target Stock as a Plan investment.  Instead, during the Class Period, a prudent fiduciary in like circumstance would have, among other things: (i) froze purchases of Company Stock by the Fund; (ii) disclosed problems regarding Target Canada; (iii) diverted Participant contributions from the Fund; (iv) sent Participants targeted letters regarding the importance of diversification in their retirement plan; (v) resigned as Plan fiduciaries; and/or (vi) sought guidance from regulators and/or outside experts.[5]  A prudent fiduciary could not have concluded that these actions would do more harm than good to the Fund.

16.     To remedy the breaches of fiduciary duties as described herein, Plaintiffs seek to recover the financial losses suffered by the Plan as a result of the diminution in value of Company Stock invested in the Plan during the Class Period, and to restore to the Plan funds that Participants would have received if the Plan's assets had been invested prudently.

## JURISDICTION AND VENUE

17.     ***Subject Matter Jurisdiction.*** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

---

[5] As noted below, these alternatives are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent.

9

18.     ***Personal Jurisdiction.*** This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

19.     ***Venue.*** Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and one or more Defendants reside or may be found in this District.

## PARTIES

A.     **Plaintiffs**

20.     Plaintiff Ann Dormani is a former Target employee and a Participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). Ms. Dormani suffered losses in her individual Plan account as a result of investing in Target Stock during the Class Period.

21.     Plaintiff Mitchell W. Knoll is a Target employee and a Participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). Plaintiff Knoll suffered losses in his individual Plan account as a result of investing in Target Stock during the Class Period.

22.     Plaintiff Dorothea Simmons is a former Target employee and a Participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). Ms. Simmons suffered losses in her individual Plan account as a result of investing in Target Stock during the Class Period.

23.     Plaintiff David Rigol is a Target employee and a Participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7). Mr. Rigol suffered losses in his individual Plan account as a result of investing in Target Stock during the Class Period.

**B.    Defendants**

**1.     The Company Defendant**

24.     Defendant Target is a Minnesota corporation headquartered at 1000 Nicollet Mall, Minneapolis, Minnesota. Target is a discount retailer, which, as of January 30, 2016, had 341,000 full-time, part-time, and seasonal employees.

25.     At all times relevant to this Complaint, Target managed and administered the Plan and the assets of the Plan and acted as a fiduciary with respect to the Plan, or appointed a committee to do so. At all relevant times, Target was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. In addition, Target is the Plan's administrator, as stated in the Forms 11-K filed on behalf of the Plan on June 13, 2014, (the "2014 11-K") and June 17, 2015, (the "2015 11-K").

**2.     The Administrator and Committee Defendants**

26.     Defendant Scott Kennedy served as Target's Vice President, Pay & Benefits, from the start of the Class Period until March 23, 2013. Defendant Kennedy was thus the Plan Administrator and the Named Fiduciary with respect to certain Plan-

related activities during that period of time. Liability is only asserted against Defendant Kennedy for such periods of time as he acted as a fiduciary of the Plan.

27.     Defendant Michael Fiddelke served as Target's Vice President, Pay & Benefits, from March 24, 2013, until the end of the Class Period. Defendant Fiddelke was thus the Plan Administrator and the Named Fiduciary with respect to certain Plan-related activities during that period of time. Liability is only asserted against Defendant Fiddelke for such periods of time as he acted as a fiduciary of the Plan.

28.     Defendant PIC, as discussed further below, had a fiduciary duty to select all the Plan's investment options. The PIC was a Plan fiduciary at all relevant times, is a juridical entity under ERISA and is named as a defendant.

29.     During the Class Period, each PIC member identified below was a fiduciary of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

30.     Defendant John Mulligan was the Chairperson for, and a member of, the PIC at all relevant times and was thus a Plan fiduciary. Defendant Mulligan was Target's Chief Financial Officer ("CFO") in 2012, served as its interim president and Chief Executive Officer ("CEO") from May to August 2014, and has been the executive vice president and chief operating officer for Target since August 17, 2015.

31.     Defendant Corey Haaland was a member of the PIC for the entire Class Period. From February 2010 until August 2015, Defendant Haaland served as Target's Senior Vice President of Financial Planning and Analysis.

32.     Defendant Scott Kennedy was a member of the PIC for the entire Class Period. As noted above, Defendant Kennedy served as Target's Vice President, Pay & Benefits from the start of the Class Period until March 23, 2013, and since then he has served as Target's President, Financial & Retail Services.

33.     Defendant Jodee Kozlak was a member of the PIC for the entire Class Period, and was Target's chief human resources officer throughout the Class Period.

34.     Defendant Michael Fiddelke was a member of the PIC from June 11, 2013, through the end of the Class Period. As noted above, Defendant Fiddelke was Target's Vice President, Pay & Benefits from March 24, 2013, until the end of the Class Period.

35.     Defendant Beth Jacob, Target's former Chief Information Officer, was a member of the PIC from the beginning of the Class Period until her employment with Target ended on March 5, 2014. According to *The Wall Street Journal*, Defendant Jacob "resigned from [Target in 2014] after a major data breach."

36.     John Doe Defendants 1-10, without limitation, comprised any other committee(s) which administered the Plan and all members thereof. The identities of the committee(s) and the members of the committee(s) which were responsible for carrying out the provisions of the Plan are not currently known to Plaintiffs. John Does 1-10 are believed to be employees of the Company and fiduciaries of the Plan.

37.     Defendants Mulligan, Haaland, Kennedy, Kozlak, Fiddelke, and Jacob are collectively referred to herein, along with any John Doe Defendants who may be identified, as the "Committee Members" and together with the PIC as the "Committee Defendants."

38.     The Plan was drafted to hard-wire the Fund as an investment option, but ERISA does not allow fiduciaries to follow such purported mandates if and when company stock is imprudent for retirement savings. As described below, the Plan and Trust agreement, read as a whole and considering ERISA's mandates, make it clear that the PIC had the authority, and duty once the Fund became imprudent, to remove the Fund as a Plan investment option.

39.     Plan Section 2.20 states that:

> The Administrator is the "Named Fiduciary" of the Plan under ERISA for purposes of the general operation and administration of the Plan, and if an "independent fiduciary" has not been selected by the Administrator, monitoring the Company Stock Fund as a "prudent" Investment Fund under the Plan. The Plan Investment Committee is the "Named Fiduciary" of the Plan with respect to selecting and monitoring the Plan's Investment Funds (other than the Company Stock Fund). If selected by the Administrator, the "independent fiduciary" is the "Named Fiduciary" with respect to monitoring the Company Stock Fund as a prudent Investment Fund under the Plan. Other persons are also Named Fiduciaries under said Act if so provided by said Act or if so identified by the Company, by action of the Board, or if so provided in this Plan. Such other person or persons shall have such authority to control or manage the operation and administration of the Plan, including control or management of the assets of the Plan, as may be provided by said Act or as may be provided in this Plan.

40.     Plan Section 9.1(a) states, in part, that "The Administrator, or the 'independent fiduciary' if one has been selected in accordance with Sec. 13.l(e), shall have the authority to determine whether and to what extent investment in the Fund will continue to be available for investment in Company Stock under the Plan."

41.    Plan Section 13.1, entitled "Allocation of Responsibility Among Fiduciaries for Plan Administration," states that:

> The Administrator, the Plan Investment Committee and the "independent fiduciary" are named fiduciaries of the Plan (each a "Named Fiduciary"). Named Fiduciaries shall have only those powers, duties, responsibilities and obligations as are specifically given them under the Plan. No fiduciary of the Plan shall be responsible for any acts or failure by another Plan fiduciary, unless the Plan provides for shared fiduciary responsibility and such shared responsibility was not allocated or delegated as described herein. The duties, responsibilities and obligations of the Named Fiduciaries are:

> (a)    The Company's Vice President, Pay & Benefits (or any successor thereto) is the Administrator and shall be a "named fiduciary" within the meaning of Section 402(a)(2) of ERISA for the Plan and, except to the extent that authority or responsibility has been assigned to the Plan Investment Committee hereunder, shall have complete responsibility, and full and absolute discretion and authority to control and manage the operation and administration of the Plan, including without limitation, the authority to:

> * * *

> (8)    if an "independent fiduciary" has not been selected, manage and control the investment in Company Stock under the Plan; ***provided, however, the Administrator does not have the authority to remove the Company Stock Fund as an Investment Fund under the Plan.***

> * * *

> (c)    The Plan Investment Committee shall be a "named fiduciary" within the meaning of Section 402(a)(2) of ERISA and shall have exclusive authority and discretion to manage and control the assets of the Plan, other than Company Stock. The Plan Investment Committee has the authority:

(1)     to establish, implement and, from time to time, review and modify as appropriate, the funding policy and investment policy for the Plan;

\* \* \*

(8)     to designate investment alternatives (other than the Company Stock Fund) to be offered under the Plan for investment by Plan Participants, Beneficiaries and alternate payees.

\* \* \*

(e)     If the Administrator has selected an "independent fiduciary" to manage and control the investment in Company Stock under the Plan, such "independent fiduciary" shall be a "named fiduciary" within the meaning of Section 402(a)(2) of ERISA and shall have exclusive power to manage and control the investment in Company Stock under the Plan; provided, however, the "independent fiduciary" does not have the authority to remove the Company Stock Fund as an Investment Fund under the Plan.

(emphasis added).

42.     Plan Section 13.3, entitled "Powers of the Named Fiduciaries" states:

(a)     As a Named Fiduciary, the Administrator, the Plan Investment Committee and the "independent fiduciary" are each authorized, to the extent permitted by ERISA, to:

(1)     as applicable, allocate fiduciary responsibilities among its members;

(2)     appoint one or more individuals or entities and delegate such of its powers and duties as it deems desirable to any such individual or entity, in which case every reference herein made to the Administrator, Plan Investment Committee or "independent fiduciary" shall be deemed to mean or include the individuals as to matters within their jurisdiction. Such individual may

16

be an officer or other employee of a Participating Employer or Affiliate, provided that any delegation to an employee of a Participating Employer or Affiliate will automatically terminate when he or she ceases to be an employee. Any delegation may be rescinded at any time;

\* \* \*

The foregoing list of powers and duties as set forth above is not intended to be either complete or conclusive. Each Named Fiduciary shall, in addition, have such powers or duties as it may reasonably determine to be necessary or appropriate in the management and operation of the Plan and Trust, provided the exercise thereof shall always conform to specific provisions hereof.

43.    Plan Section 1.6 states that "[t]he Plan is also intended to be in full compliance with the applicable requirements of ERISA. The Plan shall be administered and construed consistent with said intent."  Because ERISA does not allow for fiduciary duties to be abrogated,[6] and because ERISA 29 U.S.C. § 1104(a)(1)(D) makes clear that the duty of prudence trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary, the

---

[6] ERISA § 402(a)(1) provides that plans must be maintained pursuant to plan documents that provide for "one or more fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. 1102(a)(1). Similarly, with inapplicable exceptions, Section 403(a) mandates that "**all assets** of an employee benefit plan shall be held in trust by one or more trustees" who "have exclusive authority and discretion to manage and control the assets of the plan." 29 U.S.C. 1103(a) (emphasis added).  Moreover, ERISA § 410, 29 U.S.C. § 1110, "void[s] as against public policy" "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part."   Under these provisions, plan documents can allocate, but not eliminate, fiduciary duties with respect to ERISA plans and the management of their assets.  *See Levy v. Local Union Number 810*, 20 F.3d 516, 519 (2d Cir. 1994).

above Plan Sections 13.1 and 13.3 must be construed as stating that the Plan's Named Fiduciaries jointly had unfettered discretion with respect to the Plan's offering of all investment alternatives, including the Fund. Otherwise the Plan's shell game of abrogating fiduciary duties would violate ERISA because, based upon the Plan's language, no fiduciary had "the authority to remove the Company Stock Fund as an Investment Fund under the Plan."

44. The PIC had a fiduciary duty to select all of the Plan's investment options. In August 2014, Participants were advised in fiduciary correspondence that "[t]he [Plan's] flexible, comprehensive investment lineup is monitored by the Plan Investment Committee[,]" that "[t]he financial aspects of the plan will be determined by the Plan Investment Committee[,]" and that "[t]he selection of appropriate investments for the plan requires skillful and careful decisions of investment professionals. The Plan Investment Committee has appointed professional investment managers who direct the buying and selling of plan assets held by the trustee. These appointments may be terminated by either party at any time. The trustee also manages the investment of certain assets."  Because "Investment Fund" is defined as "one of the funds with designated investment objectives established pursuant to the provisions of Sec. 9.1 which comprises a part of the Fund" and Section 9.1 purports to hard-wire the Fund into the Plan but otherwise gives the PIC discretion over which Investment Funds are available under the Plan, the Plan is ambiguous and any of the Named Fiduciaries should have remedied the

wrongs complained of herein.[7]   The Plan purported to give *no* fiduciary the authority to remove the Fund as an investment option, but such language is violative of ERISA because the Plan fails to apportion powers that ERISA requires a fiduciary to have.

45.   The Target Corporation Master 401(k) Trust Between Target Corporation and State Street Bank and Trust Company made as of May 1, 2014, (the "Master Trust") makes clear that the PIC had the authority to remove the Fund as an investment option. Section 3.3 of the Master Trust states that:

> Subject to the Plan documents, ***the Plan Investment Committee may direct the Trustee to establish one or more Investment Funds substantially all of the assets of which shall be invested in securities which constitute "qualifying employer securities" or "qualifying employer real property" within the meaning of Section 407 of ERISA. . . .***

(emphasis added). Thus the PIC had the authority to direct the Trustee to allow (or not allow) the Fund as a Plan Investment option.

46.   The prior version of the Plan's trust agreement, the Defined Contribution Plan Trust Agreement Between Dayton Hudson Corporation and State Street Bank and Trust Company made as of October 17, 2016, (the "2006 Master Trust") similarly stated in Sections 4.2 and 4.1 that "during any time when there is no Investment Manager with

---

[7] The Plan was designed to take advantage of a "presumption of prudence" which the Courts of Appeals had formulated before the Supreme Court struck the presumption down in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014).  The general idea behind the presumption of prudence was that by commanding an ERISA fiduciary to invest in company stock, plan documents waived the duty of prudence to the extent that it comes into conflict with investment in company stock—at least absent "extraordinary circumstances" that so threaten the goal of employee ownership that the fiduciaries must assume that the settlor would want them to depart from that goal under the common-law "deviation doctrine."  *See Fifth Third*, 134 S. Ct. at 2469.

respect to a Company Managed Stock Account (such as before an investment management agreement takes effect or after it terminates), the Investment Committee shall direct the investment and reinvestment of such Company Managed Stock Account" and that "[t]he Investment Committee from time to time and in accordance with provisions of the Plan, may direct the Trustee to establish one or more separate investment accounts within the Trust Fund, each separate account being hereinafter referred to as an 'Investment Fund.' Pursuant to this authority the Investment Committee has selected the Investment Funds available as options to Plan participants."

### 3.    The Monitoring Defendants

47.    Defendant Gregg Steinhafel was Target's CEO from the beginning of the Class Period until May 5, 2014.

48.    Defendant John Mulligan was Target's CEO from May 5, 2014, through the end of the Class Period.

49.    Plan Section 13.3 states that "[t]he Company's Chief Executive Officer will appoint the members of the Plan Investment Committee" and Plan Section 13.3(a)(1) states that "[t]he Company's Chief Executive Officer shall designate one member of the Committee to act as the chair of the Committee, and the member so designated will preside over the Committee's meetings."

50.    The Committee Members served at the pleasure of Steinhafel and Mulligan (together the "Monitoring Defendants"), pursuant to Plan Section 2.26. The Monitoring Defendants had the duty and responsibility to properly appoint, monitor, and inform the Committee and John Doe defendants (as defined herein) and/or other persons who

exercised day-to-day responsibility for the management and administration of the Plan and its assets. The Monitoring Defendants failed to properly appoint, monitor, and inform such persons by failing to inform the Committee and John Doe defendants regarding the Company's true financial and operating condition or, alternatively, despite the Monitoring Defendants' adequate informing of such persons of the true financial and operating condition of the Company (including the financial and operating problems being experienced by Target in Canada during the Class Period identified herein), they nonetheless continued to allow such persons to offer Target Stock as an investment option under the Plan when the market price of Target Stock was artificially inflated and Target Stock was an imprudent investment for Participants' retirement accounts under the Plan. Liability is only asserted against each of the Monitoring Defendants for such periods of time as the Monitoring Defendants acted as fiduciaries of the Plan.

### 4.   Additional "John Doe Defendants"

51.    To the extent that there are additional officers and employees of Target who were fiduciaries of the Plan during the Class Period, or any other committees or members of such committees that were fiduciaries of the Plan in connection with the allegations herein, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-10 include, in addition to the above, other individuals, including, but not limited to, Target officers and employees, who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## CLASS ACTION ALLEGATIONS

52.     Plaintiffs bring this action derivatively on the Plan's behalf pursuant to

ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to

Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the

Plan, Plaintiffs, and the following class, to which Plaintiffs belong, of similarly situated

persons (the "Class"):

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the
> Target Corporation 401(k) Plan and/or Target Corporation
> Ventures 401(k) Plan at any time between February 27, 2013
> and August 6, 2014, inclusive,[8] and whose Plan accounts
> included investments in Target Stock.

53.     Given ERISA's distinctive representative capacity and remedial provisions,

courts have observed that ERISA litigation of this nature present a paradigmatic example

of a FED. R. CIV. P. 23(b)(1) class action.

54.     The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiffs at this

time, and can only be ascertained through appropriate discovery, Plaintiffs believe there

are at least tens of thousands of employees of Target who participated in, or were

beneficiaries of, the Plan during the Class Period whose Plan accounts included Target

Stock. For example, a 2012 Annual Report Summary sent to Participants stated that

---

[8] Plaintiffs reserve their right to modify the Class Period definition in the event that
further investigation/discovery reveals a more appropriate and/or broader time period
during which Target Stock constituted an imprudent investment option for the Plan.

"292,340 persons were participants in or beneficiaries of the plan at the end of the plan year, although not all of these persons had yet earned the right to receive benefits."

55.     Common questions of law and fact are applicable to Plaintiffs and the Class, including, but not limited to:

   a. whether Defendants each owed a fiduciary duty to the Plan, Plaintiffs, and the other members of the Class;

   b. whether Defendants breached their fiduciary duties to the Plan, Plaintiffs, and the other members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

   c. whether Defendants violated ERISA; and

   d. whether the Plan, Plaintiffs, and the other members of the Class have sustained damages and, if so, what is the proper measure of damages.

56.     Plaintiffs' claims are typical of the claims of the other members of the Class because the Plan, Plaintiffs and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

57.     Plaintiffs will fairly and adequately protect the interests of the Plan and the other members of the Class because they have no interests antagonistic to or in conflict with those of the Plan or the Class. In addition, Plaintiffs have retained counsel

competent and experienced in class action litigation, complex litigation, and ERISA litigation.

58.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

59.    Class action status is also warranted under the other subsections of Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.[9]

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.    Description of the Plan

60.    The Plan is a means for Participants to save for retirement. To that end, Defendant Target told Target employees, among other things, "[t]he TGT 401(k) ("the Plan") is a great way to save for your future" and "the TGT 401(k) is intended to help

---

[9] Class action status would also be warranted under Rule 23(b)(3) because questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

you save for your future[.]"   Plan Section 1.3, subtitled "Purpose" says that "[t]he purposes of the Plan are to encourage and assist employees in adopting a regular savings program, to help provide additional security for their retirement, and to provide them with an opportunity to acquire and maintain an ownership interest in the Company[.]" This purpose of acquiring and maintaining an ownership interest in the Company is, as a matter of law, secondary to the purpose of providing retirement income.[10]

61.    One of the investment options offered by the Plan was the Fund. The Fund was valued using unit-based accounting and invested virtually all its assets in Target Stock, with a small cash reserve held to accommodate withdrawal requests.

62.    Per the 2014 11-K, the Plan purchased more than six million shares of Target Stock in 2013 for a cost of more than $400 million. During that year, the Plan sold almost 7.4 million shares of Target Stock for approximately $489.6 million.  Not all of these sales and purchases were during the Class Period, but it is reasonable to infer that in early 2013 there would have been more sales than purchases.[11]

---

[10] Because "the content of ERISA's duty of prudence [does not vary] depending upon the specific nonpecuniary goal set out in an ERISA plan" (*Fifth Third Bancorp*, 134 S. Ct. at 2468), such as what the Plan calls the "opportunity to acquire and maintain an ownership interest in the Company" those purposes are irrelevant to the extent they conflict with the Plan's other purposes.   "[T]he term 'benefits' in [ERISA's duty of prudence] must be understood to refer to the sort of *financial* benefits (such as retirement income) that trustees who manage investments typically seek to secure for the trust's beneficiaries. . . . *The term does not cover nonpecuniary benefits like those supposed to arise from employee ownership of employer stock.*"   *Fifth Third Bancorp*, 134 S. Ct. at 2468 (emphasis added).

[11] Plan data is only available to the extent it was released in the Plan's public filings. Plaintiffs do not have access to the granular data needed to break these figures down into pre-Class Period and Class Period transactions.

63.    The 2014 11-K disclosed, in further detail, Plan transactions, many of which were before the start of the Class Period:

| (in thousands) | | **2013** | 2012 |
|---|---|---|---|
| Number of common shares purchased | | **6,002** | 6,705 |
| Cost of common shares purchased | $ | **401,232** $ | 392,059 |
| Number of common shares sold | | **7,368** | 8,598 |
| Market value of common shares sold | $ | **489,576** $ | 504,752 |
| Cost of common shares sold | $ | **335,159** $ | 357,324 |
| Number of common shares distributed to plan participants | | **168** | 236 |
| Market value of common shares distributed to plan participants | $ | **11,126** $ | 14,080 |
| Cost of common shares distributed to plan participants | $ | **7,631** $ | 9,879 |
| Dividends received (net of pass-through dividends) | $ | **49,904** $ | 43,413 |

64.    Per the 2015 11-K, the Plan purchased more than 3.8 million shares of Target Stock for more than $228 million in 2014. During that year, however, the Plan sold less than 200,000 shares for approximately $12.4 million.  As further demonstrated by the Form 11-K filed on behalf of the Plan on June 10, 2016, (the "2016 11-K")  the Plan's transaction pattern had clearly shifted during the Class Period such that the Plan became, and continued to be, a significant net purchaser of Target Stock.

| Master Trust Purchases and Sales of Target Corporation Common Stock[a] | 2015 | | 2014[b] | |
|---|---|---|---|---|
| | Purchases | Sales | Purchases | Sales |
| Number of shares | 2,433,491 | 186,981 | 2,577,181 | 136,000 |
| Amount | $189,527,826 | $14,622,950 | $154,334,146 | $8,560,039 |

[a]   The Master Trust earned dividend income of $59,067 thousand and $45,381 thousand in 2015 and 2014, respectively. Additionally, the Master Trust held 25,684,780

and 28,401,928 shares of Target Corporation common stock as of December 31, 2015 and 2014, respectively.

(b)    In addition to the activity in the table above, during the period from January 1, 2014 to April 30, 2014, the 401(k) Plan purchased 1,260,940 shares for $74,056,651 and sold 63,205 shares for $3,797,244. The 401(k) Plan earned dividend income of $13,445 thousand in this same period. Combining the above data highlights a clear trend that Defendants, as fiduciaries, knew or should have known: the Plan was selling fewer shares of Target Stock and purchasing more shares of Target Stock than it had in prior years. Defendants, as ERISA fiduciaries, could of course have requested contemporaneous transaction data from the Trustee. The Plan gave the PIC "the right at any time to remove a Trustee and appoint a successor thereto, subject only to the terms of any applicable trust agreement" (Plan Section 12.2).

65.    The Paragraph 1.4 of the Trust Agreement discusses the Trustee's "daily recordkeeping services" and Paragraph 9 of the Trust Agreement further provides that:

The Trustee shall maintain or cause to be maintained suitable records, data and information relating to its functions hereunder.

The Trustee shall keep accurate and detailed accounts of all investments, receipts, disbursements, and other actions hereunder, and such other records as the Administrator shall from time to time direct, as agreed to by the Trustee. Its books and records relating thereto shall be open to inspection and audit at all reasonable times by the Administrator or its duly authorized representatives and each Investment Manager.

66.    The PIC could have requested such information, requested the Administrator authorize it to receive such information, or terminated the Trust Agreement and negotiated a new agreement pursuant to which it could receive such information. Further, the Administrator was a member of the PIC, and thus the Administrator's knowledge is imputed to the PIC. The PIC thus knew *or should have known* the Plan's contemporaneous transaction patterns. It should not have come as a surprise to

Defendants, who also received quarterly updates as alleged above, that the Plan was, or became, a significant net purchaser of Target Stock during the Class Period.  As this trend took hold and accelerated, Defendants were bound to consider it as part of their prudence analysis as ERISA fiduciaries.

67.     Moreover, there is reason to believe Defendants *actually had* such information more regularly.  Plan Section 8.2, discussing the "Valuation of Investment Funds" states that "In the case of shares of Common Stock of the Company held in the Company Stock Fund, the Trustee shall also determine the number of shares held. Promptly thereafter the Trustee shall advise the Administrator of the values and number of shares so determined."  This was to be done on "each Valuation Date."[12]  Thus, it appears at least Defendant Fiddelke, who was also a member of the PIC, had daily information about the Fund's purchases and sales of Target Stock, which he could have shared with any PIC member at any time, and this knowledge is imputed to the PIC as a matter of law.

68.     At the start of the Class Period, or at least as of November 20, 2013, matching contributions earned by Participants were put into the Fund unless that Participant affirmatively elected to have the matching contributions invested in the same way as the personal contributions. That default option was changed on October 9, 2014, at which time Target's matching contributions automatically mirrored Participants' contributions.

---

[12] Plan Section 2.35 defines "Valuation Date" as "each business day on which the New York Stock Exchange is open is a Valuation Date."

69.     Additionally, during the Class Period, Target's dividends were automatically reinvested in the Plan unless Participants elected to receive contributions in cash.

70.     While Defendants served as Plan fiduciaries during the Class Period, in or around April 2015, Participants were advised that State Street had been appointed to serve as an independent fiduciary for the Fund. In announcing the appointment of State Street, Participants were informed that:

> participants still have the right to purchase and sell Target stock within their plan accounts, subject to plan rules and limits, and Target's Securities Trading Policy. However in the unlikely event State Street determines that continued investment in Target stock is not in participants' best interests, State Street could suspend trading in Target stock in the plan or sell Target stock held in the plan. This independent fiduciary arrangement helps avoid conflicts of interest and ensure Target is satisfying its legal obligations.

71.     Before State Street was entrusted with certain responsibilities as an independent fiduciary, Defendants retained all of those responsibilities. Moreover, even in appointing State Street as an independent fiduciary, Defendants could not completely absolve themselves of all of their fiduciary duties.

72.     Throughout the Class Period, the amount Participants could invest in Target Stock was uncapped. Effective January 1, 2016, after State Street's appointment as independent fiduciary, however, a purchase cap on the Fund within the Plan was implemented. The purchase cap limited Participants such that they could only allocate 20% of their contributions or re-balancing of their Plan account balance to the Fund, and could only do so if the overall portion of their Plan account invested in the Fund would

not exceed 20% of their account balance. If Participants had previously allocated more than 20% of their contributions to the Fund, such contributions were redirected to a target LifePath Fund based on that Participant's age.

**B.     Plan Administration**

73.     ERISA fiduciaries may not offer company stock in an ESOP unless it is prudent to do so. However, the Plan's Investment Policy Statement as of March 1, 2013 (the "2013 IPS"), which was a revision of a 2010 version of the investment policy statement, states that "[t]he Target stock fund is available to participants by virtue of the Plan's design and consequently is not subject to the selection and monitoring procedures outlined in this Investment Policy Statement."

74.     It appears that no investment policy statement was applicable to the Fund at the start of the Class Period (or at any time during the Class Period), and that the Fund was not reviewed for prudence or appropriateness as an investment option, and there was no process in place to assist the Committee in making investment related decisions "in a prudent manner" with respect to the Fund at the start of the Class Period. Indeed, the term "Investment Options" as used in the 2013 IPS specifically excluded the Fund which the Committee seems to have erroneously believed "the plan sponsor makes available to participants for investment of their defined contribution assets."

75.     Thus, unlike the other Plan investment options, for which the "Committee periodically reviews the appropriateness of[,]" it does not appear this was done for the Fund in any manner, nor that the prudence of the Fund was ever considered by the Committee.

76.    Further, the 2013 IPS recognizes that "[i]n the case of the Investment Options outside the core ESOP stock account, the Committee has implemented a Manager Continuation Policy that specifies key qualitative and quantitative evaluation criteria and procedures for applying those criteria" and "[t]he performance of the manager for each investment Option is evaluated relative to an appropriate benchmark." Benchmarks had to "satisfy seven basic criteria:" unambiguous, investable, measurable, appropriate, reflective of current investment opinions, specified in advance and ownership.

77.    Despite having reasonable benchmarks for other investment options, the benchmark for the Fund was the total return of Target's common stock. In other words, rather than measure the appropriateness of the Fund as an investment option, and rather than address the seven basic criteria recognized by the 2013 IPS, the Fund's benchmark simply measures the amount of investment drag caused by expenses and the Fund's cash buffer. This "benchmark" of Target Stock for the Fund provided no information about the prudence of offering and maintaining Target Stock or the Fund as a Plan investment option.

78.    As noted above, the PIC met on June 26, 2013. The meeting was scheduled to last 3 hours, with 1.5 hours dedicated to an annual review of "Participation / Performance / Option usage" for the Plan conducted pursuant to "materials provided by Jeff Bailey and Al Ezban [of Target Pay & Benefits]."   An administrative update provided to the PIC in the Target Corporation Pension Fund and 401(k) Plan Performance Review, First Quarter, 2013 (the "Q1'13 Review"). As the minutes state,

"Jeff Bailey and Al Ezban provided an annual review of the Target 401 (k) Plan participation, fund performance and investment option usage. This review included discussion of the 'glidepath' and performance of the LifePath funds (Exhibit D) in light of recent SEC guidance around 'Target Date Funds.'"

79.     On August 23, 2013, Al Ezban of Target sent the PIC's members a cover letter with an "accompanying report [that] provides the investment performance information for both the pension fund and the TGT 40l(k) plan during the 2nd Quarter 2013." The first four substantive paragraphs of the letter discuss the pension plan. The final substantive paragraph, which is the only paragraph to discuss the Plan, states:

> Within the TGT 40l(k), the Growth and Value Funds were eliminated as investment options in June, with assets in those funds mapped to the U.S. Large Company Stock Index Fund. The U.S. Small Company Stock Index Fund broadened its benchmark and investment holdings to include U.S. mid-capitalization stocks. In addition, five of the funds' names were changed to better reflect their investments. All of the changes were met with very little feedback from participants. The Intermediate-term Bond Fund continued to experience participant outflows during the quarter, with $49 million in net outflows or 7% of the fund's AUM. Meanwhile, the Money Market Option increased its holdings by $32 million.

80.     The PIC met on October 28, 2013, and the meeting was conducted pursuant to "materials provided by Jeff Bailey and Al Ezban [of Target Pay & Benefits]." The minutes of the October 28, 2013 meeting reflect only discussion of hedges and investment risk borne by Target in its defined benefits plan.[13] There is no mention in the

---

[13] A defined benefit plan promises a specified monthly benefit at retirement. An employer bears the investment risk. A defined contribution plan, on the other hand, does not promise a specific amount of benefits at retirement. In these plans, the employee or

minutes of the Plan, nor is the Plan addressed in the 18-page handout that the Committee received.

81.     Target's Board of Directors (the "Board") met on November 13, 2013. Defendant Mulligan was present and, among other things, "discussed the outlook for fourth quarter results, and explained how the impact of cycling over a 53 week fiscal year and a shorter Holiday shopping season this year will impact overall performance. With respect to the Canadian Segment, he emphasized that management's plan is to work through the current excess inventory issues by the end of the fiscal year."  The minutes of the November 13, 2013 meeting show that "[t]he entire strategy review was devoted to Target Canada[,]" "including continued perceptions that Target does not have strong a [sic] low price position, greater than anticipated challenges in driving traffic with our frequency business, and slower acceptance of the REDCard as a loyalty program."  The November 13, 2013 minutes also include the following:

> Tony Fisher [Who served as the President of Target Canada Co. from January 18, 2011 to May 20, 2014] led a discussion of the four key challenges that Target Canada faces at this stage, namely: instocks, supply chain, store traffic, and technology. He emphasized that all of these areas are interrelated and are being addressed simultaneously, He provided more detail on the nature of these four primary challenges, and discussed the steps management is taking to address each area. Mr. Fisher concluded by discussing the upcoming Holiday season, several technology enhancements for 2014, and noted that 2014 will provide a better view of run-state performance level given that 2013 was an extremely intensive year of startup activity.

---

the employer (or both) contribute to the employee's individual account and these contributions generally are invested on the employee's behalf.  An employee bears investment risk and ultimately receives the balance in their account.

82.    The PIC met on April 17, 2014. The agenda for the meeting shows it was scheduled to last 90 minutes, and that time was allocated as follows: 5 minutes for approval of prior minutes; 10 minutes for an administrative update; 15 minutes for performance review of investment options; 30 minutes to discuss de-risking of Target's defined benefits plan; and a 30 minute Aon Hewitt presentation regarding asset de-risking for Target's defined benefits plan. According to minutes of the meeting, "Jeff Bailey and Al Ezban [both of Target Pay & Benefits] provided a performance review for Q4 of 2013 and responded to questions and discussion by Committee members. See Exhibit A."  It appears from the documents produced that the PIC was focused on discretionary actions to reduce defined benefit plan expenses from \$67 million to \$50 million. Target_ERISA_000639.

83.    The PIC reviewed several presentations. First, several Plan funds were transitioned to other funds, being discontinued with their assets being mapped (*i.e.* transferred) to another fund. One document that the PIC reviewed shows that the defined benefit plan "maintain[ed] an aggressive risk policy" with "a very asymmetrical reward-risk position for" Target. Thus the PIC focused then, and over the next several meetings as discussed below, on the risks borne by Target in the defined benefit plan. The PIC then reviewed the Target Corporation Pension Fund and 401(k) Plan Performance Review, First Quarter, 2013 (the "Q1'13 Review"), a 26-page presentation which notes several things. Discussion of the Plan starts on page 19. In order, the data reviewed about the Plan were (1) 401(k) Plan - Participant Investment Allocations as of March 31, 2013, (2) 401(k) Plan – Total Fund Assets as of March 31, 2013, (3) 401(k) Plan - Changes to

Investment Option Allocations as of March 31, 2013, (4) 401(k) Plan - Net Cash Flows to Investment Options as of March 31, 2013, (5) 401(k) Plan – Company Match Diversification through March 31, 2013, (6) 401(k) Plan - Net Returns of Investment Options, Periods ending March 31, 2013, (7) 401(k) Plan ITBF Manager Value-Added Returns, Periods ending March 31, 2013, and (8) 401(k) Plan – Financial Engines Managed Account Participation through March 31, 2013.

84.     Of the 27-page Target Corporation Pension Fund and 401(k) Plan Performance Review, Second Quarter, 2013 (the "Q2'13 Review") presentation circulated to the PIC, eight slides are charts or graphs that discuss the Plan. It addresses the same eight slides as the Q1'13 Review, but with data as of June 30, 2013. Although these presentations were produced and exist, it is unclear whether the Committee members reviewed the presentations individually or ever discussed them with anyone. What is clear is that there are no minutes showing the Committee collectively ever reviewed or discussed the Fund.

85.     Of the 26-page Target Corporation Pension Fund and 401(k) Plan Performance Review, Third Quarter, 2013 (the "Q3'13 Review") presentation circulated to the PIC, eight slides are charts or graphs that discuss the Plan. It addresses the same eight slides as the Q1'13 Review, but with data as of September 30, 2013.

86.     Of the 26-page Target Corporation Pension Fund and 401(k) Plan Performance Review, Fourth Quarter, 2013 (the "Q4'13 Review") presentation circulated to the PIC, eight slides are charts or graphs that discuss the Plan. It addresses the same eight slides as the Q1'13 Review, but with data as of December 31, 2013.

87.     On June 19, 2014, Al Ezban of Target sent the PIC's members a cover letter with an "accompanying report [that] provides the investment performance information for both the pension fund and the TGT 40l(k) plan during the 1st Quarter 2014."  The first four substantive paragraphs of the letter discuss the pension plan. The final substantive paragraph, which is the only paragraph to discuss the Plan, states:

> In the TGT 40l(k), the Intermediate-term Bond Fund continued to experience participant outflows during the quarter, with $14 million in outflows or 2.5% of the fund's AUM. Meanwhile, the Money Market Option experienced only a slight outflow of 3.2 million. ***Almost all of the 401(k)'s stock and Life Path funds recorded inflows during the quarter, continuing the trend seen in the last 12 months.***

(emphasis added).

88.     The Target Corporation Pension Fund and 401(k) Plan Performance Review, First Quarter, 2014 (the "Q1'14 Review"), first focuses on the defined benefit plan. It addresses the same eight slides as the Q1'13 Review, but with data as of March 31, 2014.

89.     The Target Corporation Pension Fund and 401(k) Plan Performance Review, Second Quarter, 2014 (the "Q2'14 Review"), first focuses on pension plan de-risking for the defined benefit plan. It addresses the same eight slides as the Q1'13 Review, but with data as of June 30, 2014. The presentation then has a "Timeline of Major 401(k) Plan Policy Decisions" which notes that "The PIC has streamlined and reduced risk in the 401(k) plan for many years" (ignoring that the Plan held artificially inflated Target Stock with a market value of billions of dollars). The presentation then has data about participants by age and income group, among other data, and comparison

of funds to their benchmarks. One slide shows that the benchmark for the Target Corporation Common Stock Fund was 99.5% Target Common Stock+ 0.5% Cash. The presentation also shows investment option usage that almost all age groups had more than 20% of their Plan account balances in Target Stock, and with the exception of headquarters employees, all groups of employees had significantly more than 20% of their account balances in Target Stock. Moreover, 32% of active employees had more than 50% of their Plan balance in Target Stock, and for non-employee participants, the percentage was even higher. Finally, the Q2'14 Review has investment option usage data and data about Plan expenses and defined benefit plan expenses.

90.    Despite the fact that ESOP fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general, except that they need not diversify the fund's assets, the Plan's Investment Policy Statement as of Sept. 24, 2014 (the "2014 IPS") states that "[t]he Target stock fund will be subject to a separate investment policy statement and consequently is not subject to the selection and monitoring procedures outlined in this Investment Policy Statement."  Despite agreeing to do so to the extent it existed, no separate investment policy statement was produced and Target has represented production is complete. Plaintiffs therefore reasonably assume and allege that there was no investment policy statement governing the Fund. Thus, unlike the other Plan investment options, for which the "Committee shall periodically review the appropriateness" for the Plan, it does not appear this was done for the Fund. Additionally, the 2014 IPS setup performance evaluating metrics "provides valuable information concerning the investment program's strengths and weaknesses and identifies areas of

potentially profitable enhancements" for the Plan, but these metrics also did not apply to the Fund. Indeed, while the PIC states that "[t]he Committee views its investment policy as *a robust set of guidelines and procedures* and therefore does not anticipate major revisions unless the financial conditions of the Plan or the Corporation change significantly" (emphasis added), nothing in the IPS applied to the Fund. The 2014 IPS has the same discussion of benchmarks as the 2013 IPS.

### C.    Target's Failed Canadian Expansion

91.    Before Target expanded into Canada, Target management set a revenue goal of $100 billion by 2017. When that goal was set, Target, which then served only domestic markets, generated less than $70 billion in annual revenue ($67.39 billion and $65.357 billion in 2010 and 2009, respectively).  In an effort to supplement its projected domestic revenue, Target looked north because it could not reasonably expect to achieve its revenue goal domestically.

92.    On January 13, 2011, Target issued a press release announcing the launch of the Company's first international expansion. The press release announced that Target agreed to purchase 220 leasehold interests operated by retail chain Zellers Inc. for C$1.825 billion (nearly $1.846 billion USD on that same date). Holding so many leases without generating revenue at any of the dormant sites would be a drain on Target, compelling the Company to open as many stores as fast as possible. Per the press release, "Target expect[ed] to open 100 to 150 Target stores throughout Canada in 2013 and 2014."

93.     In Target's annual 2012 report, which was sent to all members of the Class, Defendant Steinhafel referenced Target's "two years of exceptional dedication and hard work" to prepare for the international expansion. However, in the end, the market entry seemed rushed and oversized, with 124 stores opening within ten months, as detailed below. As the *Harvard Business Review* concluded, "A slower rollout of stores, the model that worked so well for J. Crew, might have helped it to gain experience in the market and adjust its strategy before expanding further."

94.     But as Defendant Steinhafel would later admit to Target Canada employees, the biggest mistake made in the course of Target's Canadian expansion was the structure of the initial real estate deal.[14]  Indeed, in the rash agreement to purchase the entire portfolio of Zellers leases – after being told that Wal-Mart was interested – Target quickly agreed to the hefty sum after Wal-Mart had backed out of the negotiations.

95.     This rash agreement was made despite the fact that, as reported by *Fortune*, "most Zellers stores were dumpy, poorly configured for Target's big-box layout, and were in areas not frequented by the middle class customers Target covets."[15]

96.     The failed implementation of critical information systems as Target Canada made its roll-out dilutive of earnings and profit, to the point that Target's prediction of Target Canada being near-term accretive to earnings and profit switched to new management being "unable to find a ***realistic*** scenario that would get Target Canada to

---

[14] Castaldo, Joe, *The Last Days of Target: The untold tale of Target Canada's difficult birth, tough life and brutal death*, Canadian Business ("Canadian Business").

[15]    Wahba, Phil, *Why Target failed in Canada,* Fortune ("Fortune"); *see* http://fortune.com/2015/01/15/target-canada-fail/.

profitability until at least 2021." In other words, the hopes for near-term earnings and profit expressed during the Class Period were unrealistic, causing Target Stock to be artificially inflated.

97.    The problems resulting from the failure were known to Target and other Defendants that was obvious long before Target Canada was shuttered. Technology permeates every step of Target's retail process, from its sourcing of products, to its distribution of products to stores, to the point of sale ("POS"), where the product is purchased at the register. As Target stated in the introduction to the Company's Annual Report on Form 10-K for 2010, the Company's "ability to deliver a shopping experience that is preferred by its customers . . . is supported by our strong supply chain and technology infrastructure[.]" In fact, during a conference call discussing Target's 2012 financial results, Defendant Steinhafel discussed Target's Canadian expansion, stating, "[W]e've got a good plan that is *centered around our supply chain investments and the readiness of our distribution centers*[.]" (Emphasis added.)

98.    Target's first Canadian store opened on March 5, 2013, to significant demand: "by the time the doors officially opened at 8 a.m., there were already a hundred people in line outside, and several hundred more followed in the hours afterwards."[16]

99.    Target's venture in Canada was improperly planned. As recognized by the Affidavit of Mark J. Wong filed in connection with Target Canada's bankruptcy (the "Wong Affidavit"):[17]

---

[16] *Bargain hunters and pranksters up before dawn to line up at Canada's first Target store*, The Canadian Press.

12. [Target Canada Co. ("TCC")] believes that it did not succeed due to the following principal issues, among others:

(a) *Issues of scale:* TCC opened 133 stores across Canada in less than two years. This was, in part, an attempt to allow its operations to quickly reach an efficient scale. The breadth of the expansion stretched TCC's resources and limited TCC's ability to respond quickly and effectively to certain issues, including issues noted below. In addition, the opening of that many stores resulted in market densification - particularly in large cities served by more than one Target store- and reduced the impact of many of the new store openings.

(b) *Supply chain issues:* Although TCC invested heavily in information technology to create synchronized retail, inventory and distribution systems for the Canadian operations, TCC has encountered significant supply chain issues. TCC stores were often: (i) out-of-stock for important merchandise, resulting in consumer dissatisfaction; and (ii) over-stocked on other merchandise, necessitating discounts to manage the inventory and impairing operating margins. These supply chain issues created a poor first impression in Canada and prevented TCC from offering the wide assortment of merchandise consistent with Canadian consumers' expectations. Although TCC has invested heavily and improved many of the initial supply chain issues, many potential customers appear to have returned to or maintained the shopping practices they had before ICC's entry into Canada.

(c) *Pricing and product issues:* Many in the Canadian market expected TCC to follow Target's U.S. prices, which is a significant source of loyalty to the Target brand and a factor that differentiates Target from many of its competitors. Rather than match or reflect the U.S. prices in Canada, ICC's pricing model was designed to compete with other similar Canadian retailers and included generally higher prices than Target's U.S. stores. This appears to have limited ICC's ability to distinguish itself in the competitive Canadian retail marketplace. Many Canadian consumers also expected TCC

---

[17] *Available at* https://www.alvarezandmarsal.com/sites/default/files/Affidavit%20of%20M.%20Wong%20%28January%2015%2C%202015%29.pdf

to carry the same products as U.S. Target stores. While Canadian stores carry many of the same products as Target's U.S. stores, the precise product mix could not be replicated in Canada.

(d) *No online presence:* Although Target Corporation has an established and successful online retail business, TCC elected to focus on the build-out of the physical stores and improving store operations, and did not prioritize the establishment of an online retail business for Canadian customers. This turned out to be a significant competitive disadvantage as the retail market moves beyond traditional bricks-and-mortar stores. Target Corporation and TCC, along with their financial and other advisors, have analyzed a variety of options to overcome this absence- including extending the U.S. online Target.com retail business to Canada or establishing a stand-alone online Target.ca retail business- but none of these options are expected to stop the projected significant losses from TCC's operations, as discussed below.

These problems were known to Target and other Defendants but not disclosed long before Target Canada was abruptly closed.

100.   According to *Canadian Business*, "In the U.S., Target used custom technology that had been fine-tuned over the years to meet its exacting needs, and the corporation had developed a deep well of knowledge around how these systems functioned."

101.   When expanding into Canada, however, Target opted to implement entirely new information systems rather than those already used in Target's U.S. operation. The existing systems would have required customization to account for a different currency and also French-language characters. Those changes would have been time-consuming; and Target Canada's extensive real estate leaseholds, with so many dormant stores, would not bear the cost. Accordingly, the Target employees tasked with making the

decision chose the enterprise software system SAP. According to *Canadian Business*, SAP "essentially serves as a retailer's brain, storing huge amounts of data related to every single product in stores. That data would be fed by SAP into Target's other crucial systems: software to forecast demand for products and replenish stocks, and a separate program for managing the distribution cent[er]s."  Accordingly, Target Canada's entire operation relied on the proper implementation of SAP.

102.    As described in *Canadian Business*, "[w]hile SAP might be considered best in class, it's an ornery, unforgiving beast." Indeed, other large retailers allowed time frames over several years to implement SAP. For example, the second largest grocery store chain in Canada, Sobeys, spent four years trying to implement SAP before abandoning the effort. Loblaws, another Canadian grocery store chain, began implementing "SAP in 2007 and projected three to five years to get it done. The implementation took two years longer than expected because of unreliable data in the system."  Incredibly, in the words of *Canadian Business*, "Target was again seeking to do the impossible: It was going to set up and run SAP in roughly two years."

103.    The former employees interviewed for the *Canadian Business* article describe difficulties with Target Canada's systems and supply chain that were apparent approximately one year before the first store opened.

> Strange things started happening in 2012, once ordering began for the pending launch. Items with long lead times coming from overseas were stalled—products weren't fitting into shipping containers as expected, or tariff codes were missing or incomplete. Merchandise that made it to a distribution cent[er] couldn't be processed for shipping to a store. . . . What appeared to be isolated fires quickly became a

43

raging inferno threatening to destroy the company's supply
chain. It didn't take long for Target to figure out the
underlying cause of the breakdown: ***The data contained
within the company's supply chain software, which governs
the movement of inventory, was riddled with flaws. At the
very start, an untold number of mistakes were made, and the
company spent months trying to recover from them***.

(Emphasis added.)

104.    Target Canada's issues began with the data underlying the functioning of

SAP – each item entered into the system has dozens of information points associated with

it. Prior to stocking each item, this data had to be entered into SAP. During the

investigation of the SAP system failures, "an astounding number of errors" were

discovered. According to *Canadian Business*, "[i]t was also something the company

should have seen coming. The rush to launch meant merchandisers were under pressure

to enter information for roughly 75,000 different products into SAP according to a rigid

implementation schedule."  In the rush to get SAP set up in time to launch according to

Target's schedule, merchandising assistants relied on vendors for the information to input

into SAP, but the "information from vendors is notoriously unreliable, [and]

merchandising assistants were often not experienced enough to challenge vendors on the

accuracy of the product information they provided."  The investigation showed that

information entered into SAP was only about 30% accurate, compared to 98-99% in the

Target's U.S. system.

105.    Because hiring an outside consultant would have taken too long, Target

Canada was left with only one option—shut down the merchandising system and have

employees manually confirm all of the data in the system. Thus, a "data week" was

launched, ultimately taking two weeks. During that time, Target Canada employees identified incorrect information, including "dummy data" that was entered when SAP was initially set up and now had to be expunged. But actual corrections of the data were processed in a Target office in India, not by the onsite Target Canada employees, adding another level of complexity to Target Canada's already extensive data issues.

106.   In addition to SAP, Target Canada was operating a forecasting and replenishment system made by a company called JDA Software. JDA Software, in order to run effectively, needed "years of historical data to actually provide meaningful sales forecasts."  In order to operate the software, according to *Canadian Business*, Target "relied on wildly optimistic projections developed at U.S. headquarters. According to someone with knowledge of the forecasting process in Minneapolis, the company treated Canadian locations the same way they did operational stores in the U.S. and not as newcomers that would have to draw competitors away from rival retailers."  Relying on the brand to sell itself, Target predicted selling double whatever Zellers sold in the same store, despite the out-of-the-way location of some of the 124 stores. As a result, Target Canada's distribution centers were overloaded with inventory in its first year of operation.

107.   Target Canada's distribution centers were impacted by both excessive inventory and "lingering data problems."  The distribution centers used a software system called Manhattan, which did not communicate properly with SAP. Different dimensions and quantities in the systems rendered shipments unrecognizable. "As a result, that shipment wouldn't exist within the distribution cent[er]'s software and couldn't be

processed. It would get set aside in what was designated as the 'problem area.'" Target Canada's distribution problems were so extensive that the Company had to rent storage facilities to store goods. But given the already crippling software issues and lack of a sufficient process for temporarily storing this inventory, merchandise that was sent to the rented facilities was not easily retraced for distribution.

108.    Target Canada's technical issues had real ramifications in stores. Although the distribution centers were overloaded with merchandise, many store shelves were empty. Because the various software programs were improperly implemented and did not work well together, new stock was sometimes not ordered and thus not restocked. In addition, an automated replenishment function was disabled, either due to human error or intentional conduct, and did not order new stock in the first instance. As a result of all this, many Target Canada customers became frustrated with a shopping experience that could not meet the quality of Target's U.S. stores or the extensive hype generated by Target's advertising in Canada.  *See Fortune* ("Opening 124 stores within such a short period of time led to havoc with inventory planning, causing a big problem with stock outs early on, disappointing shoppers expecting to see the same abundance they would see cross-border shopping in the United States."); *see also* http://www.slate.com/blogs /moneybox/2015/01/15/target_closing_in_canada_these_pictures_show_why_it_failed.ht ml (pictures depicting empty retail shelves).

109.    It is evident that the problems at Target Canada were well-known to United States based executives, such as Defendants, early on during the Class Period.  Indeed, a

May 21, 2014 *Gawker* article provided the following "dispatch from a management-level

employee at Target Canada:"

> I am a Canadian and I was hired in early 2012 to take on a
> leadership role for Target Canada stores. From the beginning,
> a lot of emphasis, time and energy was put into in my
> training. The primary focus of which, was acclimating to the
> Target "culture" - I spent months training in the U.S. at
> stores, District and Regional offices. I can say that I agree
> with the previous poster on the "passive aggressive" nature of
> Target's performance management. The overly sincere "we're
> here to HELP you" approach was a constant drain on the
> senses, as it was akin to swimming with smiling sharks. The
> real problems, however, became much clearer after we started
> opening stores.
>
> We've heard a lot about the Guest being unhappy with the
> Target Canada experience, but I can say with confidence that
> for MANY of us working there, the "Target experience" was
> not what we expected either. I can disseminate (from my
> perspective) why the company finds itself in the predicament
> it does today, and hopefully enlighten some readers on how
> ingrained and widespread the problems are.
>
> International Assignees or IAs - these are key Team Members
> from the U.S. at various levels of leadership who came to
> Canada for a "limited timeline" under the guise of helping set
> up the stores and teams for success. Instead, we found that
> these folks were not guides or resources, as much as they
> were obstacles to progress. If it didn't come from/work in the
> U.S. then it was not a discussion point. To come to a country
> as large, demographically and regionally different as Canada,
> and assume that the same "playbook" used in the U.S. would
> work in Canada was incredible.[18] The inability of the "IAs"

---

[18] "It's critical to have a Canadian close to the top or at the top," Mr. Minakakis [CEO at
Toronto-based retail consulting firm Inception Retail Group Inc.] said.  Like the varying
regional consumer differences in the U.S., "there are consumer and cultural differences
between B.C., Alberta, Quebec and the Maritimes. You need to understand those nuances
in order to be able to make good strategic decisions. Just because something sold well in
the U.S. doesn't mean it will resonate with Canadians."  Shaw, Hollie, *Target fires
president of Canadian arm, replaces with 15-year U.S. company veteran*, Financial Post

to think and work beyond this led to us attempting to Xerox the U.S. store culture (for Team Members and Guests) instead of develop one that is tailored to Canadian tastes and attitudes. As things began to go downhill, the IAs were extremely pointed, and openly opined that the Canadian Team Members worked "differently & less hard" and overall "took less accountability" than they were used to in the U.S. That was an exact quote that came from my boss (an IA himself). Many of these IAs were scheduled to return to the U.S. this year... And most have been asked to remain. So much for the claim that the Canadian Target business be "run and operated by Canadians".

A highly prescriptive & misguided operational approach – now as an experienced retail professional, I can appreciate and frankly, I prefer an environment where I can do what I do best: execute the plan. But when the plan is so flawed, it became clear that we were doomed for failure at the start. Target is notorious for driving out innovation, and in most cases that is required for a large, multinational retailer with expected standards of operation. But when those highly prescriptive plans only highlight our failures, there's no question we fed the beast when it came to Guest dissatisfaction. Stores have scores of empty shelves, endcaps, sections that could easily be filled with inventory on-hand, however Target DOES NOT WANT US TO FILL THEM. The POG (planogram) must be executed 100% flawlessly - even if it means the shelves are empty because what is supposed to be there isn't on hand right now. In other words, we had way too much of things that we didn't need, and not enough of things we did need. Basics like milk, food or consumables that drive repeat business are always out of stock. Store Leaders would catch major crap if they chose to fill a 4 foot shelf with more pillows (that were in stock) versus leave it empty (because there was no bedding on-hand that was supposed to be put there). Working in the store, we know empty shelves look terrible. Target would not allow us to make the decision to fill a 4 foot shelf. Again, I'm all for ensuring integrity of the POG (that's the only way to truly

(May 20, 2014), *see* http://business.financialpost.com/news/retail-marketing/target-canada-president/wcm/a2e9a972-c59b-4eb7-98b2-59dfb69f5158

determine what's in/out of stock), but that was another problem that was self inflicted by...

Store Inventory and Distribution problems - simplest way to put this, is that you can't sell it if you don't have it. There was LOTS we didn't (and stores still don't...) have. Target had to open 124 stores in less-than one year, but they also had to open 3 national distribution centers to service those stores, the HQ in Mississauga Ontario, and many Regional and District offices throughout the country. The undertaking was so aggressive; it's little wonder that the ability to stock the distribution centers with the "right" product (e.g. what stores actually needed) was an afterthought. Did you know that there is no way for stores to know what is at the Distribution Centre, and what is arriving each day by truck? Stores have ZERO idea. You could hope/pray and expect one thing, and open a full 54 foot trailer full of something completely different (and usually do). What kind of system is this? Unique to Canada as the U.S. has a different system altogether (one presumably that works). What do you do then? You stock and fill the shelves in the backrooms. The front of store & shelves remains empty.

Compromised expectations by Guests - So put yourself in the role of a Store Leader; you have empty shelves and a stockroom packed with stuff you don't need/already have out. You could fill the empty shelves with some of that product but... You'd get nailed for not maintaining the Planogram (you get several passive aggressive coaching visits by senior leadership almost weekly – and they check for this). The Guest has NO IDEA that it's such a crap-show - and frankly, they shouldn't care. A lot of noise has been made about the prices not being comparable to pricing to the U.S. but I think that's only a small part of it. Pretend you're a Target Guest. You come in to shop and spend your money and you see... Empty shelves. What you want and need is not available. Not last week, yesterday, today or tomorrow. You are disappointed because you WANTED to be a Target Guest, and now you can't even get milk or eggs on a regular basis as those products are rarely in stock, never mind buy the cute dress/purse, etc. that Target so wants you to buy at their store. Target failed to make the stores compelling enough to change your shopping habit. You don't trust them with your shopping

because they haven't delivered with their ability to stock what you want to buy. What does the price in the U.S. mean when you don't have anything to sell here in Canada anyhow? So, nothing to sell means sales are below forecast. What is the impact of that? Well, the most immediate is to Team Members.

Unrealistic expectations of Team Members - In the time I was with Target Canada, we participated in significant staff reductions that were mandated by HQ and Senior Leadership. In some cases, these "rightsizing" exercises resulted in reductions of almost 40% of overall store headcount. Have you been to a Target store in Canada recently? If you go with your kids, you likely outnumber the staff on duty at any one time. The service culture that was so important to Target (why we were "better" than the competition) is now non-existent. The toll this has taken on Team Members is shameful. 99% of Target Canada Team Members are Canadians, the vast majority of whom left other jobs (that they liked and were good at) to join Target Canada. The recruitment of talent was such an undertaking as we only wanted the best in retail working for us. Now you have a 1 in 3 chance you'll be "rightsized" out of a job. As with most "rightsizings", the headcount changes, but the level of work remains – it's just divided among less people. Say you get to keep your job – your reward for being a valued and high contributing Team Member is that you get to do MORE work, while many of your colleagues and friends are let go. Not exactly a cheerful work environment. Did I mention that many of the International Assignees that were scheduled to return to the U.S. and contribute virtually nothing in terms of being subject matter "experts" remain?

Target coming to Canada was a complex problem, many saying it was rushed, and it's true. We HAD to renovate (in most cases extensively) 124 old Zellers locations within a 1-year period across the country after taking on the leases, as the major landlords would not allow for these stores to be closed for longer than that. Faced with stiff penalties (and complete ownership of unfinished stores) we rushed to hit a deadline that severely undercut our ability to roll out the stores and experience we wanted to. The seeds of Target Canada's problems were sown way before the first store even

opened – it was with the flawed plan and dogged
determination to execute it anyway. I learned first-hand the
effect of this. I was ultimately also part of a restructuring and
am no longer with the company. I do have many friends that
are still there, however, and the prospects for them continue
to be grim. Overall I'd call my time with Target frustrating
because it was an unfulfilling experience that did not leverage
the experience and talent of the people they hired.

Nolan, Hamilton, *Why Was Target Canada Such a Disaster*, *Gawker*; *see*
http://gawker.com/why-was-target-canada-such-a-disaster-1579554288 ("*Gawker*").

110.   This detailed post on Gawker, issued during the Class Period, makes it
evident that the problems at Target Canada, particularly the issues with product
distribution, were systemic and evident to executives in the United States prior to the start
of the Class Period.

111.   Target Canada's technological issues extended to checkout. Target
purchased POS software from a company called Retalix. Retalix's software was
relatively unknown at the time, and Target did not test the software extensively prior to
implementing it in stores. POS problems included self-checkouts that gave incorrect
change, cash registers that were slow or froze, scanned items that displayed incorrect
prices, and transactions that appeared to be complete but simply were not processed.
According to *Canadian Business*, when Retalix representatives went to Toronto in 2014
to work on a solution, one executive stated "I don't understand how you're using this[.]"
Further complicating the use of Retalix software, in November 2012, NCR Corp. agreed
to acquire Retalix, and that transaction closed weeks before the start of the Class Period
on February 6, 2013.

112.    In an interview with Minnesota Public Radio, Joe Castaldo, the author of

the *Canadian Business* article, called Target Canada's failure "the biggest, worst IT

nightmare you could imagine[.]"[19]

113.    Despite the extensive technological and supply chain issues that hampered

Target Canada's ability to function, Target failed to disclose to the market the scope of

Target Canada's problems and the increasing unlikelihood of its near-term profitability.

**D.    Target Stock Was Artificially Inflated During the Class Period**

114.    Before the start of the Class Period, when Target announced that it would

expand into Canada, Target and its then-CFO Douglas Scovanner, among others, made a

series of statements about the expansion, including, in 2011, that Target is "so excited

about our transaction in Canada" because "[w]e strongly believe that several years out,

Target sales and EPS will be higher in our long term growth prospects, stronger, with this

transaction than they would be without it[,]" "we expect to be generating $600 million or

more, perhaps quite a bit more in EBITDA out of Canada at retail in the next six or seven

years[,]" " And almost without question, when we turn the corner from having expenses

and no revenue to having lots and lots of revenue -- billions and billions and billions of

dollars of Canadian revenues, we will turn the corner pretty sharply from a generation of

EPS standpoint." Mr. Scovanner also stated:

> By 2017 we expect to have 150 or more Target stores in
> Canada with average annual sales of about $40 million or so,
> driven by the performance of the nucleus of the top 100
> former Zellers stores averaging more like $45 million a unit.

---

[19] "The downfall of Target Canada," *Minnesota Public Radio*, January 29, 2016,
*available at*: https://www.mprnews.org/story/2016/01/29/target-canada-failure.

> We continue to believe that our margin structure in Canada
> will produce EBITDA margins in the range of 12% of sales
> by the fifth year of store operations. To us, these overall
> performance metrics feel real and feel achievable.

115.   Contrasted with the reality that Target was "unable to find a *realistic* scenario that would get Target Canada to profitability until at least 2021[,]" these statements about Target Canada generating significant profits and EPS, and the statement below, resulted in Target's stock being artificially inflated.

116.   Prior to the Class Period, Target disclosed limited financial information relating to the Company's Canadian expansion. Such information generally concerned the quarterly start-up expenses, depreciation, and amortization associated with the expansion and the concomitant effect on Target's earnings.

117.   Throughout the Class Period, however, the value of Target Stock was artificially inflated as a result of material misrepresentations about the progress of the Canadian expansion and the success of Target's new Canadian stores. Indeed, Target continually failed to apprise the market of the true state of its Canadian venture, and Defendants were or should have been aware of the same based upon their positions at Target.

118.   On February 27, 2013, Target issued a press release announcing its fourth quarter and full-year 2012 earnings. The press release "reported fourth quarter net earnings of $961 million, or $1.47 per share, and full-year net earnings of $2,999 million, or $4.52 per share[,]" and stated that "[f]or fiscal 2013, the Company expects adjusted EPS of $4.85 to $5.05 and GAAP EPS of $4.70 to $4.90." Regarding the Canadian

expansion, the press release quoted Target CEO Gregg Steinhafel, who stated "We believe these results position us well to deliver on significant plans in 2013, including completion of the largest store opening program in our company's history with 124 stores in Canada[.]" The press release also disclosed that the Company's Canadian segment's "[f]ourth quarter and full-year 2012 EBIT was $(148) million and $(369) million, respectively, due to start-up expenses, depreciation and amortization related to the Company's expected market entry in 2013." As a result, "[t]otal expenses related to investments in Target's Canadian market entry reduced Target's earnings per share by approximately 18 cents in fourth quarter 2012 and 48 cents in fiscal 2012[.]"

119. On the same date, the Company held a conference call to discuss Target's fourth quarter and full year 2012 financial results. In his prepared remarks, Steinhafel praised the Company's achievements during the year, including "an unprecedented effort required in Canada to finish three distribution centers, begin renovating stores, build an IT solution, and hire thousands of Canadian team members[.]" Indeed, Steinhafel represented that "Canada is on track[.]" Steinhafel further stated:

> [I]n the Canadian segment, we expect to transition from recording meaningful quarterly dilution in the year to recognizing accretion by the fourth quarter.

> \*\*\*

> In 2013, we expect Canadian segment to generate approximately $0.45 of dilution to our GAAP EPS, as the cost to open and operate Canadian stores, along with the depreciation related to our capital investments, offsets the profitability we generate from the locations after they open. Dilution is expected to exceed $0.45 through the first three

quarters, after which we expect the segment to contribute several cents of positive GAAP EPS in the fourth quarter.

\*\*\*

Looking to Canada, we expect that the first quarter will mark the peak of dilution attributable to this segment, at about $0.23. However, this is expected to be more than offset by accounting gains from the receivables sale, leading to an expectation of first quarter GAAP EPS in the range of $1.22 to $1.32.

\*\*\*

Following this year, our current view of 2014 has us fully on or above the path outlined in our long range financial plan, benefiting from Canadian segment accretion and a meaningful increase in the amount of capital available to return to our shareholders through dividends and share repurchase.

120.   Defendant Mulligan also participated in the following exchanges on the

February 27, 2013, call:

MARK WILTAMUTH: Okay. Can you give us a little more color on the Canada dilution of $0.45? I think that's bigger than a lot of people were expecting, and it sounds like a lot of it's related to the capital spending decisions. If you could walk us through that a little bit?

JOHN MULLIGAN: Yes. I think that's right, Mark. When we look back on where we're at right now with Canada, we feel really good about where we're at and our projections for returns in Canada. If we look back a year ago, or even two years ago when we signed the deal, the projected EBITDA for this quarter -- for this year, excuse me, is essentially right on where we thought it would be.... .

\*\*\*

PETER BENEDICT: . . . I think in the past you guys have said that you'd expect to recapture the Canadian losses that you accrue within two years of turning profitable. So if you

sum up the last three years -- well, the last two years plus this year -- it's a little over $1, maybe $1.10. Do you still expect to get that back in earnings from Canada in '14 and '15, or is the D&A going to make that a longer process?

JOHN MULLIGAN: I think you hit on it. It'll be a little bit longer. We're not talking about five years or anything like that. But 2.5, three years, something like that, our current modeling would say, we'll get it back in, something like that. So a bit more than two years.

121.   On March 4, 2013, Target issued a press release announcing that:

it is opening three pilot stores in Ontario on March 5 at Stone Road in Guelph, Milton Mall Shopping Centre in Milton and Gates of Fergus in Fergus. The three pilot stores are the first Target locations to open in Canada, and the first of 124 Target stores that will open across the country throughout 2013. ***This marks the final phase in a testing process, which was designed to prepare systems, train team members and determine operational readiness as the first wave of 24 stores soft open across Ontario later in March.***

Emphasis added.

122.   Also on March 4, 2013, Tony Fisher held a press conference at the pilot store in Guelph, Ontario to discuss the upcoming opening of the first stores in Canada and, in particular, the purpose of utilizing pilot stores. Fisher stated, in pertinent part:

These are what we're calling our pilot stores. Our pilot stores are really our stores that we're using to continue to test and refine some of our processes, some of our training, some of our systems. We built our technology infrastructure from the ground up over the last two years. So there's a lot of things we want to test both from technology, continuing to train our team members. You'll see as we go throughout the store that we're still putting the finishing touches on our store. You'll notice the stanchion on the way in that says we're mostly open. You'll notice some of the signs on some of our merchandise that says, we're stocking up so you can too.

123.   In the Company's Annual Report on Form 10-K, filed with the SEC on March 20, 2013 (the "2012 10-K"), Target further portrayed the Canadian expansion as business as usual. For example, the 2012 10-K contained Target's typical explanation that its business is "supported by our strong supply chain and technology infrastructure," despite experiencing significant setbacks relating to the technology supporting Target's Canadian supply chain at least since 2012. Target further misled the market by stating in the 2012 10-K, without disclosing the crippling difficulties being experienced by Target Canada, that "[e]ffective inventory management is key to [Target's] ongoing success[,]" that the Company "carefully plan[s] inventory levels for seasonal and apparel items to minimize markdowns[,]" and that the Company "rel[ies] extensively on [its] computer systems to manage inventory[.]"   By failing to acknowledge the above-mentioned failures, Target kept the market's expectations of Target Canada high, thus inflating the Company Stock price.

124.   On March 28, 2013, Target continued to hype the success of the Company's Canadian expansion at the CIBC Retail & Consumer Conference. During the conference, defendant Mulligan, then-CFO, stated that all four of the necessary components in Target's Canadian expansion – "build out of the supply chain; build the technology; build the team; and then begin to remodel stores" – had been achieved, and "with a great deal of financial discipline. . . . [Doing] so with $0.48 of dilution versus [the Company's] goal of $0.50"

125.   Then, on May 22, 2013, before the market opened, Target issued a press release announcing its first quarter 2013 ("Q1 2013") earnings. In the press release,

Target reduced its financial guidance, stating that "[f]or full-year 2013, [it] now expects adjusted EPS of $4.70 to $4.90, compared with prior guidance of $4.85 to $5.05. GAAP EPS [wa]s expected to be $4.12 to $4.32, approximately 58 cents lower than adjusted EPS due to" Canadian operations. As for Canadian Segment Results, the release stated:

> Target opened its first 24 Canadian stores in March 2013, which generated sales of $86 million in the first quarter with a gross margin rate of 38.4 percent. EBIT for the first quarter was $(205) million, as gross margin of $33 million was offset by $238 million in start-up expenses, operating expenses, depreciation and amortization related to the Company's market entry. Canadian operations reduced Target's GAAP earnings per share by 24 cents in first quarter 2013(2).

> _____

> (2)This amount includes interest expense and tax expense that are not included in the segment measure of profit. A reconciliation of non-GAAP measures is included in the tables attached to this release.

126.  Target's May 22, 2013 press release included the following:

> "Target's first quarter earnings were below expectations as a result of softer-than-expected sales, particularly in apparel and other seasonal and weather-sensitive categories," said Gregg Steinhafel, chairman, president, and chief executive officer of Target Corporation. "While we are disappointed in our first quarter performance, we remain confident in our strategy, and we continue to invest in initiatives, including Canada, our digital channels and CityTarget, that will drive Target's long-term growth."

127.  On May 22, 2013, Target also held its Q1 2013 Earnings Conference Call.

In their prepared remarks Mr. Steinhafel and Mr. Mulligan stated in part that:

> [Mr. Steinhafel:] After two years of preparation, in March we opened our first 24 Canadian stores in the greater Toronto area and *we're very pleased with the reception we received from our new Canadian guests*. . . .

Two weeks ago we opened our second wave of 24 Canadian stores in British Columbia, Alberta and Manitoba and we're very pleased with the initial guest response in these markets and the ability of our teams and systems to accommodate the increasing volume of traffic and sales.

\* \* \*

In Canada, second-quarter sales will ramp up meaningfully from the first-quarter pace, yet startup expenses will continue to dominate the P&L. As a result, for the quarter we anticipate expenses from our Canadian operations, including interest expense measured outside the segment, will create $0.16 of dilution to our earnings per share. We continue to expect Canadian dilution will come down further in the third quarter and by the fourth quarter we expect our Canadian operations will be slightly accretive to our consolidated earnings. All together, we expect second quarter adjusted EPS of $1.09 to $1.19. We expect our GAAP EPS will be $0.19 lower than adjusted EPS, in the range of $0.90 to $1, reflecting $0.16 of dilution due to Canada and $0.03 of dilution related to the unwind of the beneficial interest asset related to the receivable sale.

\* \* \*

Colin McGranahan: Of course. As the consumables business ramps up it mixes down. From a productivity perspective, can you tell anything yet on these first stores that are open, in terms of opening expectations relative to what you had thought? Or was it just too much hoopla that you can't discern anything yet?

Gregg Steinhafel: I wouldn't call it hoopla. I would just say that the guests were very, very excited and we experienced tremendous surges in sales. And it's just very, very early to draw any conclusions. And we really wanted to deliver a great experience and so to a certain extent we went in with staffing levels to make sure that we were taking care of the guest, both at the front end and we had the right team members there for the supply chain and we had the right teams on the sales floor. So we know that over time and in a run state in addition, we have to work hard at making sure that we get our productivity levels where the business models

dictates them to be. And we know our gross margins will settle in and we've got to become more productive and run the business. Over time our consumables share will grow.

That's the hardest trip to change with the guest and so we're going to continue to focus on those frequency-oriented categories so that we can not only get the good mix that we're getting, but we want to now start driving more trip frequency into the store. We didn't want to come out of the blocks by hitting those categories too hard because we wanted to make sure that we led with our strength. And we wanted to make sure that all the supply chains and the operational disciplines were in place. We feel very confident now that they are. We're ready to start making those kinds of adjustments in merchandising and supply chain and in store operations to start refining the model.

* * *

[Mr. Mulligan:] In Canada, *second-quarter sales will ramp up meaningfully from the first-quarter pace*, yet startup expenses will continue to dominate the P&L. As a result, for the quarter we anticipate expenses from our Canadian operations, including interest expense measured outside the segment, will create $0.16 of dilution to our earnings per share. We continue to expect Canadian dilution will come down further in the third quarter and by the fourth quarter we expect our Canadian operations will be slightly accretive to our consolidated earnings.

128.   Later in the call, in response to an analyst's question relating to Target Canada's productivity expectations, Defendant Steinhafel stated "[W]e wanted to make sure that all the supply chains and the operational disciplines were in place. We feel very confident that they are. We're ready to start making those kinds of adjustments in merchandising and supply chain and in-store operations to start refining the model." Thus, Defendant Steinhafel gave the market the impression that the issues facing Target Canada's supply chain could be solved by mere tweaks. Given the state of Target

Canada's information technology and supply chain infrastructure, however, a complete overhaul was necessary. Defendants and other Target employees made similar misleading statements that downplayed the issues facing Target Canada throughout the Class Period, inflating of the price of Company Stock.

129.   On May 30, 2013, Defendant Mulligan attended the Sanford C Bernstein Strategic Decisions Conference. A transcript of Mulligan's discussion at the event was disseminated to the market by Target posting the transcript on its investor relations page. During his presentation, Mulligan was asked about execution risk concerning Target Canada. In response, Defendant Mulligan claimed, "A lot of the execution risk is behind us."   Further, Defendant Mulligan continued to downplay the significant problems at Target Canada, stating "We're still refining. Things like replenishment systems, they take a while to tune, and so we're tuning, and each one of the stores will be different. So we're working through that."   Accordingly, Defendant Mulligan gave the market the impression that the systemic problems in Target Canada's supply chain infrastructure were relatively minor and were in the process of being solved.   Defendant Mulligan also added "And, finally, Canada -- when you invest billions of dollars and record losses in your P&L, you obviously generate a very large negative ROIC. We expect that to turn in the fourth quarter of this year as we turn to accretion and then that will grow. So the ROIC will naturally improve in Canada."

130.   Other Defendants, who included Beth Jacob (Target's former Chief Information Officer), Scott Kennedy (Target's President, Financial & Retail Services), and Corey Haaland (Target's Senior Vice President of Financial Planning and Analysis),

should have, by virtue of their positions at Target, been aware of the problems at Target Canada, discussed above.

131.    Before the markets opened for trading on August 21, 2013, Target reported its second quarter 2013 earnings. Target reported second quarter net earnings of $611 million, or $0.95 per share, and noted that for full-year 2013 it "expects adjusted EPS will be near the low end of its previous guidance of $4.70 to $4.90." The press release also touted the Company's performance in Canada: Steinhafel stated, "In Canada, where we are only five months into our market launch, we continue to learn, adjust and refine operations in our existing stores as we prepare to open another 56 stores by year-end." Financially, the Company's Canadian operation "generated sales of $275 million at a gross margin rate of 31.6 percent in second quarter 2013."

132.    On the same day, Target also held a conference call to discuss the Company's second quarter 2013 earnings. Steinhafel highlighted the Canadian expansion without disclosing any setbacks:

> In our Canadian segment, we've reached the halfway point in our 2013 market launch. We opened another 44 Canadian Target stores in the second quarter, putting our total at 68 today, on the way to our goal of operating 124 Canadian stores by year end. Launching our Canadian segment has required a massive effort from teams throughout the Company, including building a completely new supply chain infrastructure and integrated technology solution, completely reconstructing former Zellers locations transforming them into brand new Target stores, hiring and training more than 15,000 Canadian team members, and creating unique merchandise strategies and assortments to fit the preferences of our Canadian guests, including a very strong presence in our home and apparel categories.

The team's execution on these efforts has been excellent. As a result, our Canadian stores have seen strong initial traffic and the mix of our sales in home and apparel has been even higher than expected. . . .

* * *

Our expectations are informed by our experience in launching the PFresh remodel program and City Target format, as well as our historical experience entering new markets in the US. In many of these markets we saw similar pattern in which sales momentum was slower than expected at the launch, but grew rapidly in the first several years after opening, resulting in achievement of our fifth year sales goals. For the stores we've opened, the team in Canada is working to adjust inventory and store staffing to match the pace of sales in each individual location. And for the segment in total, we have updated the expected timing of earnings accretion.

* * *

MATT   NEMER,   ANALYST,   WELLS   FARGO SECURITIES, LLC: A quick follow up on Canada and then a couple on the US business, as well. Could you talk to the inventory overhang in Canada, the clearance that you spoke to, is that primarily also on frequency items, or is that more a discretionary product?

GREGG STEINHAFEL: The inventory overhang is a function of the shortfall primarily in some of the seasonal categories. So, think of -- even though Apparel and Home was strong, the variability by store, and the fact that some of our seasonal categories, like Lawn and Patio didn't perform at the level that we were expecting. So, it was not in the basic categories or the non-discretionaries, primarily in a subset of the discretionary categories. But it's one of those things where it's more obvious, because it's such a large number of stores.

But it's the same kind of fine tuning that we go through every time we open a new store here in the United States, and they have experienced for years and years. There is always a tremendous amount of fine tuning and getting the right match of sales volatility, variability, assortment, and aligning that with inventory. What we're seeing in Canada is there's such a

big critical mass that it stands out, and it's far more obvious.
But it's no different than what we've experienced here.

133.    Likewise, on the conference call Defendant Mulligan expressed optimism about Target's prospects in Canada, stating that although the Company had experienced "a slower than expected ramp up in sales following the grand opening rush, . . . the team continues to refine operations in the stores already opened, ensuring that inventory and expenses match the current pace of sales in each individual store."  In response to a question from an analyst, Steinhafel stated that inventory overhang experienced in Canadian stores was "a function of the shortfall primarily in some of the seasonal categories" no different than those experienced by the Company's stores in the United States, and would be fine-tuned as is done in U.S. stores.  Defendant Mulligan also participated in the following exchanges:

> SEAN NAUGHTON: Yes, so the question is is there an ability to say that the Canadian business will be -- you believe the Canadian business may be accretive in 2014.

> JOHN MULLIGAN: So on 2014, I think it's very early here, and we've given you our best view. I think when you step back we've been operating 60 some stores for on average about 2.5 months, and so we're giving you our best information here for 2013. And clearly sales are a little bit short of where we need to work through some of the inventory and optimizing the business and optimizing our expense structure.

> * * *

> I think as we look forward getting another 56 stores open, getting through a holiday will certainly provide a lot more information about where we expect to be. But in 2014, I think we expect to see meaningful improvement in the profitability of Canada. We'll cycle past all of the start up expenses, we'll have our inventories more in line with sales patterns that we

now have some information on. Our expense structure will be optimized to the sales level and we'll start to grow sales. So I think we'll see meaningful improvement in 2014, but I would say probably from this perspective today, unlikely that we'll see profitability on the full year. And we'll be back to provide a little bit more information on what that looks like, and the cadence throughout the quarters, again, as we get a little bit more information this year, get the stores open, get new markets and get through a holiday season most importantly.

GREG MELICH, ANALYST, ISI GROUP: I wanted to follow up on Canada and then touch on the US. Just to make sure I've got that right, or maybe ask it a different way, John, if you look at the incremental Canadian dilution this year, how much of it is related to those items of clearance? How much of it would be related to, if you will, start up costs or advertising? How much of it do you think is just a different margin structure in the business to drive that frequency in trips?

JOHN MULLIGAN: Yes, I think parsing that all out is difficult. I would say that the second one, incremental marketing and advertising is not material to the total move from where we were to where we are today. I think the biggest driver of the change in profitability or dilution this year comes from, we had a set of sales expectations as we entered in the market, and we also, given all of the excitement that we saw building over two years, we protected on the upside from an expense standpoint and from an inventory standpoint, and the sales have been somewhat disappointing. And so we need to work through those inventories. There's some clearance activity, there was some excess inventory this quarter, as well, that we work through. And we need to right size the entire expense structure for what -- for the sales numbers that are currently -- that we're operating at. So, I think that's the vast majority of it.

134.   In response to the Company's second quarter results and low-range guidance, Target's stock price declined by $2.45 per share, or over 3.6%, to close at $65.50 on August 21, 2013.

135.   Also on August 21, 2013, Tony Fisher was interviewed about the Company's Canadian expansion by the Wall Street Journal. Fisher engaged in the following exchange with the interviewer regarding the necessary changes to Target's Canadian operations:

> WSJ: When Target launched in Canada it faced criticism for inventory shortages at some of its stores and higher pricing here compared to its U.S. stores. What is Target doing to address these criticisms? Is Target making any other changes to the way it operates in Canada?

> Mr. Fisher: We have a lot of tweaks that we need to make as far how we replenish the stores, what categories we are replenishing, which ones are selling better, which ones are slower. They're not transformational changes, really tweaks to make sure that we are consistent with replenishing the stores based on the guests' shopping.

136.   Then, on October 30, 2013, Target held a Financial Community Meeting in Toronto, with Defendants Steinhafel and Mulligan participating, along with Target Canada president Tony Fisher. In his remarks, Fisher explained that Target Canada was "doing whatever it takes to clear excess merchandise out of our supply chain so we can more efficiently and correctly flow product from our distribution centers to our stores." To that end, Fisher explained that "[a] key part of this work is getting more familiar with—and efficient in—the use of our technology and tools." (Emphasis in original.) Discussing the use of technology to meet Target Canada's hurried opening, Fisher stated, "To stick to our timeline, we decided to build and integrate an entirely new technology infrastructure with best-in-class packaged solutions from Retalix, JDA, SAP and WMS." Of course, just a few months later, Retalix representatives would visit Target Canada and

express shock that Target Canada was actually operating with the Retalix system in its then-present state. Likewise, Fisher omitted, and Defendants, based upon their positions should have known that Fisher omitted, the fact that the JDA forecasting software relied on Target Canada employees' estimates—as opposed to actual historical results—to forecast inventory needs. Accordingly, Fisher's statements to the market portrayed Target Canada as successfully integrating and using technology for the benefit of its supply chain management – thus inflating the Company Stock price – when in fact Target Canada's information systems were not set up properly, the various software programs failed to communicate with each other properly, and Target Canada continued to suffer supply chain and inventory issues, and Defendants knew or should have known that Fisher's statements inflated the market price.

137.    Defendant Mulligan stated the following at the a Financial Community Meeting:

> You can see that while it is steeper than we initially planned, our updated expectation is well within the range of our experience in the US. In fact, our Canada plan now matches the pattern we saw following the launch of some of our strongest US markets, including Philadelphia and Washington DC. Furthermore, as Tony explained earlier, we have a clear understanding of the reasons why we have seen initial softness and we have a detailed plan to address them.

> * * *

> As Gregg mentioned, we have made a long-term investment in these stores and we continue to expect them to be very productive assets. In the meantime, we are devoting all necessary resources and doing whatever it takes to get our inventory and operations in line.

138.   On November 21, 2013, before the market opened, Target issued a press release announcing its third quarter 2013 earnings. Target disclosed third quarter net earnings of $341 million, or $0.54 per share and noted that for full-year 2013 it "expect[ed] adjusted EPS of $4.59 to $4.69."   During the quarter, the Company's "Canadian Segment generated sales of $333 million at a gross margin rate of 14.8 percent, driven by efforts to clear excess inventory."   The Canadian segment's "gross margin of $49 million was offset by $221 million of start-up and operating expenses and $66 million of depreciation and amortization."   Overall, Target's "Canadian operations reduced Target's GAAP earnings per share by (29) cents in third quarter 2013[.]"

139.   On the same day, Target also conducted a conference call to discuss the Company's third quarter earnings. During the call, Steinhafel continued to tout the Company's Canadian prospects:

> The Target Canada team is energized and prepared for the holiday season, and preparing to enter 2014 with improved in-stocks and a much better inventory position. We continue to see a very strong mix of our higher margin home and apparel categories in Canada. However, third quarter gross margin rate in Canada was unusually low as the team worked diligently to eliminate excess inventory and enhance flow throughout the supply chain. This activity led to heavier third quarter mark-downs and higher than expected dilution of $0.29 in our Canadian segment. Process improvement efforts and inventory clean-up will continue in the fourth quarter as well.

140.   Likewise, on the conference call Mulligan reported that Target "opened another 23 stores in the third quarter even as [the Company] continue[s] to work to refine operations and improve performance. In the quarter, the team made a lot of progress in

their efforts to begin to rationalize our inventory position, update item counts in stores and distribution centers, and improve network flow." Referring to the effects of the Canadian segment's inventory issues on financial results, Mulligan explained that "[Target] do[es] expect pressure on Canadian segment gross margin to persist in the fourth quarter as we continue to do whatever it takes to enter 2014 with improved operations and a notably better inventory position."

141. In response to the Company's results and guidance, Target's stock price declined by $2.30 per share, or over 3.45%, to close at $64.19 on November 21, 2013.

142. On January 10, 2014, Target issued a Press Release, in which it provided early estimates for the Company's 4Q13 financial results. In the release, the Company stated, *inter alia*, that it expected approximately ($0.45) of dilution related to the Canadian Segment, compared with prior guidance (of November 21, 2013) of a range between ($0.22) to ($0.32). The Company stated that the revised dilution numbers were "driven by the gross margin impact of continued efforts to clear excess inventory." On this news, the price of Target common stock declined from $63.34 per share on January 9, 2014 to close at $62.62 per share on January 10, 2014 – a decline of approximately $0.72 per share, or approximately 1.14%.

143. On February 26, 2014, before the market opened, Target issued a press release announcing its fourth quarter and full-year 2013 earnings. Target reported fourth quarter net earnings of $520 million, or $0.81 per share, and full-year net earnings of $1.971 billion, or $3.07 per share. Regarding Target's Canadian Segment Results, the release stated:

> In fourth quarter 2013, the Canadian Segment generated sales of $623 million and EBIT of $(329) million. The fourth quarter gross margin rate of 4.4 percent reflects continued efforts to clear excess inventory. Canadian operations reduced fourth quarter GAAP EPS by (40) cents[.]
>
> During fiscal 2013, Target's Canadian Segment generated sales of $1.3 billion at a gross margin rate of 14.9 percent and EBIT of $(941) million. Canadian operations reduced Target's full-year 2013 GAAP EPS by $(1.13)[.]

144.  On the same day, Target also held a conference call to discuss the Company's earnings. During the call, Defendant Steinhafel played down reduced margins in the Company's Canadian segment as the result of markdowns meant to reduce inventory. Looking to the future, Defendant Mulligan touted the Canadian segment's prospects, stating:

> In the Canadian segment, sales came in just below expectations. Importantly as Gregg mentioned, we took advantage of holiday traffic to clear through a significant amount of excess inventory in the quarter, and while we expect some small lingering issues with long lean receipts this year, the Canadian segment ended 2013 in a much cleaner inventory position. paving the way for smoother operations in 2014. In all, the segment drove $0.40 of EPS dilution in the fourth quarter, better than the expectations we provided in our January press release.
>
> * * *
>
> And having dramatically reduced the congestion in our Canadian supply chain, we will increase the intensity of our marketing message in 2014 regarding value and assortment in our frequency categories. Over time, we expect this will lead our Canadian guests to choose Target more often in these categories, driving meaningful increases in traffic and sales.

145.  On March 14, 2014 Target filed its annual report on Form 10-K with the SEC for 2013. The filing stated, in part:

In fiscal 2013 we opened 124 Target stores in Canada, which was our first retail store expansion outside of the United States. Our initial sales and operating results in Canada have not met our initial expectations. Improving our sales in Canada is contingent on our ability to deploy new marketing programs that positively differentiate us from other retailers in Canada, and achieve market acceptance by Canadian guests. In addition, our sales and operating results in Canada are dependent on our ability to manage our inventory to offer the expected assortment of merchandise to our Canadian guests while avoiding overstock situations, and general macroeconomic conditions in Canada. If we do not effectively execute our marketing program and manage our inventory in Canada, our financial results could be adversely affected.

146. Providing no reason why the Company suffered, *inter alia*, a massive $941 million EBIT loss, the 2013 Form 10-K merely noted that "due to the start-up nature of our Canadian Segment," certain of the financial information Defendants provided "may not be indicative of future results." Target also provided no explanatory information with respect to the considerable dilution to GAAP earnings per share that was credited to the Canadian Segment.

147. After less than one and a half years of store operations in Canada, the Company was forced to change direction. On May 5, 2014, Target filed a Current Report on Form 8-K with the SEC, disclosing that Steinhafel had resigned from his positions with the Company, including as a director, and that Mulligan would be appointed interim president and CEO.

148. In response this news, Target's stock price dropped by $2.14 per share, or more than 3.45%, to close at $59.87 on May 5, 2014.

149.    In the wake of Steinhafel's departure, commentators concluded that Target's Canadian segment's difficulties were likely a key factor. For example, retail analyst Wayne Hood of BMO Capital Markets Corp. stated "Mr. Steinhafel's departure comes on the heels of several challenges the company had recently faced, namely 1) stumbling out of the blocks in Canada . . . ."  Steinhafel's departure letter also cited "a slow start in Canada" as one of the low-points in his career with the Company, per news reports. *The Wall Street Journal* published an article reporting that "Target's foray into Canada has stumbled badly and been dogged by losses and cost overruns."

150.    Soon after Mr. Steinhafel's departure, on May 20, 2014, Target announced the termination of Tony Fisher as president of Target Canada. Recognizing the Company's failures in Canada, in connection with the change, interim CEO Mulligan stated "[o]ne of our key priorities is improving performance in Canada more rapidly and we believe it is important to be aggressive."

151.    Contrary to Target's earlier assertions that the Company's weak performance in Canada was the result of expansion and growth difficulties that were within the normal range of experience with the Company's U.S. stores, analysts noted that many of Target's problems were avoidable. Indeed, retail-sector analyst Doug Stephen opined that "***These aren't problems you run into two days before your launch***." In a separate report published by *The New York Times*, Luke Sklar, the founder of Sklar Wilton and Associates, a marketing and retail consulting firm in Toronto, called the result "a shocking, shocking level of misstep."

152.   The *Winnipeg Free Press* pointed to multiple failings on the part of the Company in connection with its Canadian expansion, including pricing discrepancies relative to U.S. stores, attempting to open too many stores over a short period of time, and poor store locations. In addition, the two years between Target's expansion launch and its actual opening gave the Company's competitors ample time to prepare.

153.   In reaction to these announcements, Target's stock price fell $1.68 per share, or 2.88 percent, to close at $56.61 per share on May 20, 2014.

154.   The poor performance of Target's Canadian segment and its impact on the Company as a whole were caused by internal problems at Target, including with its management, and were related to persistent problems with the Company's Canadian supply chain, information technology, and related systems which presented undisclosed risks and operational hurdles. By omitting to disclose these problems, the expectations of the Company's Canadian expansion were improperly increased.

155.   On May 21, 2014, Target issued a press release announcing its fourth first quarter 2014 earnings.  For the Canadian Segment, Target reported first quarter 2014 EBIT losses of $211 million and a first quarter gross margin rate of 18.7 percent, reflecting the "continued impact of efforts to clear excess inventory, including long lead-time receipts." Target also reported that it expected Adjusted EPS of "85 cents to $1.00" in the second quarter of 2014.

156.   Defendant Mulligan also participated in the following exchanges on a May 21, 2014, earnings call:

MATTHEW NEMER: Okay, great. And secondly, can you talk to the early cycle stores versus the later cycle stores in **Canada** -- anything you can share on the difference between the financial metrics and the various cohorts? Thanks.

JOHN MULLIGAN: Yes, as we said, we continued to see improvement across the Business into April, as the guest data improved and our sales performance improved. And the early cycle stores continue to be the best. And it's, again, almost in order down the sheet: cycle one, cycle two, cycle three, cycle four, cycle five.

So, the earliest stores, the longer they have been open, they perform the better. But the good thing is: All cycles on an upward path. We're not where we need to be, and we're not where we need to be versus our expectations, but it's good to start to see some progress.

157.    On May 29, 2014, Defendant Mulligan, responding to an April 28, 2014,

SEC letter, wrote to the SEC that:

During [2013], we experienced significant supply chain issues that contributed to inadequate in-stock levels and excess inventory in our distribution facilities. These issues, combined with softer-than-expected sales, resulted in performance below our expectations. Because of the interrelated nature of these issues, we were unable to separately identify and quantify the impacts from start-up issues versus lower-than-expected sales and earnings. For that reason, we attributed our gross-margin performance to a combination of these issues.

158.    On August 5, 2014, Target issued lowered guidance for the second quarter

of 2014, noting that the "Canadian Segment" was  hampered by "[s]omewhat softer-than-

expected sales combined with the impact of continued investments to clear excess

inventory." On this news, the price of Target common stock declined from $60.70 per

share on August 4, 2014 to close at $58.03 per share on August 5, 2014 – a decline of

approximately $2.67 per share, or approximately 4.4%. Target Common stock continued to decline on August 6, 2014, from $58.03 per share on August 5, 2014 to close at $57.97 per share, as analysts commented on Target Canada's continued problems.

159.   Less than a week later, on August 12, 2014, Target admitted to the market, for the first time, that the problems with its supply chain IT systems were indeed systemic and, as a result, a full reset of its dreadful supply chain was necessary. The Company announced a "variety of initiatives to address in-stock issues" that Target had experienced in Canada since the beginning. In particular, the Company announced, that it would conduct, *inter alia*, a "physical count of inventory at all stores, **resulting in a reset of systems**, and more accurate ordering and shipping data."

160.   On August 20, 2014, Target held a conference call with analysts and investors during which Target officials, including Defendant Mulligan, revealed part of the reason why Target had performed so poorly, as announced on August 5, 2014. Defendants expanded on the steps being taken to attempt to rectify Target Canada's supply chain problems that were first identified on August 12, 2014. Kathee Tesija, Target's Chief Merchandising and Supply Chain Officer, stated that "[t]o address in-stocks, the team is taking action on four dimensions: **better reporting to identify in stock issues sooner; retraining our teams on best methods; developing new best methods tailored to Canadian segment systems; and reconfiguring systems** to work more effectively over the long run." Defendants also announced that same-store sales decreased more than 11% in Canada over the prior year as a result of ongoing supply chain problems. Because the only stores that could be included in this metric were stores

open for at least a year as of June 2013, this figure directly contrasted with Defendant Mulligan's statement on the May 21, 2014 call that the early cycle Target Canada stores were performing well.

161.   As a result of Target's false and misleading statements and omissions during the Class Period, Target's common stock traded at artificially inflated prices. However, as the condition of Target's business, including its Canadian operations described above, were revealed to the market, the market price for Target common stock fell from its Class Period-high closing price of $73.32 per share on July 24, 2013 to $57.81 per share on August 6, 2014, causing significant loss of Plan assets, including the wasting of assets by purchasing Target Stock during the Class Period.

**E.   Post-Class Period Developments**

162.   On July 31, 2014, Target announced that its Board had appointed seasoned retail and consumer products veteran Brian Cornell as the Company's next chairman of the Board and CEO, effective August 12, 2014.

163.   Less than six months later, on January 15, 2015, the Company issued a press release announcing the discontinuance of Target's Canadian operations and the filing of corporate reorganization in the Ontario Superior Court of Justice. Specifically, the press release quoted Cornell, who stated, "[a]fter a thorough review of [Target's] Canadian performance and careful consideration of the implications of all options, we were unable to find a realistic scenario that would get Target Canada to profitability until at least 2021."   As a result of the discontinuance, the Company announced that it "expect[ed] to report approximately $5.4 billion of pre-tax losses on discontinued

operations in the fourth quarter of 2014, driven primarily by the write-down of the

Corporation's investment in Target Canada, along with costs associated with exit or

disposal activities and quarter-to-date Canadian Segment operating losses[.]" Moreover,

the Company "expect[ed] to report approximately $275 million of pre-tax losses on

discontinued operations in fiscal 2015." In total, as the Wong Affidavit (see ¶ 92) attests,

> TCC is completely operationally funded by its parent, Target
> Corporation, and related entities. TCC has put considerable
> financial pressure on Target Corporation and TCC continues
> to consume significant cash. It is projected that TCC's
> cumulative operating losses from its entry into the Canadian
> market to the end of the 2014 fiscal year (ending January 31,
> 2015) will be more than CAD $2.5 billion pre-tax- more than
> triple the originally expected loss for that period. It is
> projected that TCC's operations would remain unprofitable
> for at least five years, and would require significant and
> continued funding from Target Corporation during that
> period.

Wong Affidavit ¶ 11; *see also* ¶ 15 ("All of TCC's operational funding is provided

exclusively by Target Corporation and related entities. Target Corporation has invested

more than CAD $7 billion into the expansion into Canada since the start of 2011.

Following the thorough review of TCC's performance described above and careful

consideration of all options, I am informed by senior management of Target Corporation

that the board of directors of Target Corporation has determined that, in its business

judgement, it is in the best interest of its business and its shareholders to discontinue

operations in Canada and focus on driving growth and building further momentum in its

omnichannel U.S. business. Without further funding and financial support from Target

CASE 0:17-cv-04049-JNE-SER   Document 1   Filed 08/30/17   Page 78 of 117

Corporation, the Applicants are unable to meet their liabilities as they become due and are therefore insolvent.")

## F.    Fiduciary Action Could Not Have Resulted in More Harm Than Good to the Fund

164.    By the beginning of the Class Period, Defendants, as insiders of the Company, knew or should have known that Target's expansion into Canada artificially inflated the price of Target Stock. As noted above, analysts recognized that "[t]hese aren't problems you run into two days before your launch."  Thus Target was woefully unprepared for the expansion and faced tremendous expectations—expectations that were supported by the Company's public statements—which were not reflected in the price of Target Stock. Nonetheless, Defendants continued to allow the Plan to hold and invest tens of millions of dollars in Target's artificially inflated securities.

165.    ERISA requires the fiduciaries of a pension plan to act prudently in managing the plan's assets, including employer stock. Fiduciaries of ERISA plans that hold employer stock are subject to the same duty of prudence that applies to ERISA fiduciaries in general, except that they need not diversify the fund's assets.

166.    Plaintiffs' claims exist because Defendants, who were Target employees, ignored their knowledge of material misrepresentations and omissions in violation of the federal securities laws. While ERISA allows corporate insiders to serve as fiduciaries, it does not allow those corporate insiders to ignore problems discovered as a result of their employment with a company, especially where compliance with ERISA would not

require violation of securities laws (and, indeed, where the requirements of ERISA and the securities laws could have been served by the same prudent actions).

167.    Defendants' obligation to take actions to protect the Plan was triggered as soon as they knew or should have known that the share price of Target Stock was artificially inflated. In other words, Defendants violated their fiduciary duties under ERISA at more or less the same time some of them violated their duties under the federal securities laws. If Defendants had timely complied with their duties under ERISA, there would have been little or no artificial increase in the share price before the Fund was removed as an investment option. In actuality, however, Defendants continued to authorize the Fund as an investment option for a considerable time after they knew or should have known that the share price was artificially inflated.

168.    ERISA required Defendants to prevent and/or mitigate, to the extent possible, damages to the Plan and Participants caused by the artificial inflation of Target Stock that Defendants learned about in their corporate capacity. To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.

169.    Given the relatively small number of shares of Target Stock purchased by the Plan when compared to the market float of Target Stock, it is extremely unlikely that this decrease in the number of shares that would have been purchased, considered alone, would have had an appreciable impact on the price of Target Stock.

170.    Recognizing that the price of Target Stock had become artificially inflated by the materially misleading information relating to Target's expansion into Canada, Defendants should not have merely stayed the course, continuing to purchase Target Stock on behalf of the Plan and the Class for more than its true value. Indeed, Defendants plausibly could have taken any of several alternative actions to comply with their duties as fiduciaries of the Plan, including: (i) freezing purchases of Company Stock by the Fund; (ii) disclosing problems regarding Target Canada; (iii) diverting Participant contributions from the Fund; (iv) sending Participants targeted letters regarding the importance of diversification in their retirement plan; (v) resigning as Plan fiduciaries; and/or (vi) seeking guidance from regulators and/or outside experts. None of these steps would have (a) violated securities laws or any other laws, or (b) been more likely to harm the Plan's Target Stock holdings than to help.

**Freeze Purchases of Target Stock by the Fund**

171.    The Plan was a significant net purchaser of Target Stock during at least portions of the Class Period. The 2015 11-K shows that between January 1, 2014, and April 30, 2014, the Plan spent $74,056,651 purchasing 1,260,940 shares of Target Stock and sold 63,205 shares of Target stock for $3,797,244.[20]  That is consistent with the June 19, 2014 cover letter received by the Committee (*supra* ¶ 87) that stated "[a]lmost all of

---

[20] While the Plan's transactions for the balance of 2014 were largely outside of the Class Period, the trend continued: During the period from May 1, 2014, to December 31, 2014, the Master Trust spent $ 154,334,146 purchasing 2,577,181 shares of Target Stock and sold 136,000 shares of Target stock for $8,560,039.

the 401(k)'s stock and Life Path funds recorded inflows during the quarter, continuing the trend seen in the last 12 months."

172.   Defendants knew or should have known the Plan's transaction pattern in real time. *See supra* ¶¶ 65-67.

173.   Given their contemporaneous knowledge of large cash inflows into the Fund, Defendants could have (and should have) directed that all Company and Plan Participant contributions to the Fund be held in cash or some other short-term investment rather than be used to purchase artificially inflated Target Stock. A refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions and would not have required any independent disclosures that could have had a materially adverse effect on the price of Target Stock. A prudent fiduciary in similar circumstances would not have viewed this decision as more likely to harm Participants than help them, and if Defendants had considered the prudence of Target Stock as a Plan investment option, it is the only rational choice they could have made given the data available to them.

174.   Moreover, this option would not affect any ability of Participants to direct or diversify assets credited to their accounts, to obtain loans from the Plan, or to obtain distributions from the Plan, because Participants would be free to transact in units of the Fund as they previously were, and thus no disclosure would be required, and no signals, mixed or otherwise, would be sent to the stock market.

175.   Nor would the Plan's ceasing to purchase additional Company Stock likely have sent a negative signal to the market that would be more likely to harm Participants than help them.

176.   The Fund's significant Class Period net purchases mean that no sale would have been required to implement a purchase freeze, and suggest that the Fund's cash inflows would have more than satisfied any redemption requests, thus allowing the Fund to build a buffer to dampen the inevitable loss that would have resulted from purchasing artificially inflated Target Stock.   Further, because there would be no purchase or sale of any security, insider trading rules would not be implicated.

177.   Notably, on April 17, 2017, Defendants announced that "[e]ffective June 22, 2017, a purchase freeze [of the Target Stock Fund] will go into effect."  *See* http://hie.ah-ist.com/target/D2017-04-17/TGT-A-401k_and_DB.pdf (Target Stock Fund Purchase Freeze in TGT 401(k) and Other Benefit Notices) (last accessed on August 21, 2017).  Plaintiffs have seen no evidence that the freeze has affected Target's stock price in any noticeable way.  Plaintiffs have found no public disclosure by Target regarding this freeze.  Plaintiffs contend this step should have occurred on an early date during the Class Period.

178.   Adjusting the Fund's buffer would also not put Defendants "between a rock and a hard place" as discussed in *Fifth Third* because Defendants could not be colorably sued for disobeying Plan documents in violation of § 1104(a)(1)(D).[21]  The "rock and a

---

[21] The Supreme Court also warned that "[t]he proposed presumption makes it impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious, unless the

hard place" scenario refers to plan documents conflicting with ERISA's duty of prudence, but putting assets into the Fund's cash buffer would not implicate Plan documents which state that "The stock bonus portion [of the Plan] is an employee stock ownership plan within the meaning of Code section 4975(e)(7) that is designed to invest primarily in Company Stock (the 'ESOP Portion')." Plan Section 1.2; *accord* Plan Section 1.6. As long as the Fund was *primarily* invested in Target Stock, and the Plan specifically "contemplated that from time to time the Trustee may hold funds in the Company Stock Fund temporarily awaiting investment in shares of common stock of the Company. Such funds may, pending such investment, be invested in short term securities issued or guaranteed by the United States of America or any agency or instrumentality thereof, or any other investment of a short term nature, including corporate obligations or participations therein." Plan Section 9.1(a)(2).

179. The only different from Participants' perspective would be instead of investing the Fund's assets almost exclusively in Target Stock, they would be investing a slightly smaller amount in Target Stock and a slightly higher amount in income producing, liquid assets. Simply stated, the Fund's significant inflows combined with its massive holding of Target Stock and its negligible cash buffer when it only had to hold

---

employer is in very bad economic circumstances." The warning clarifies that an employer need not be in very bad economic circumstances for a plaintiff to plead a meritorious claim that its stock was imprudent for retirement savings.

"primarily" Target Stock gave Defendants considerable flexibility.[22]   The Fund's risk and return profile would not materially change, but tens of millions of dollars could be protected from the artificial inflation in Target Stock that Defendants knew or should have known about.

180.   Year-over-year netted purchases or sales were disclosed, as alleged above in ¶¶ 62-64, but the Fund's buffer was disclosed as being "approximate" to participants and was never disclosed to the public—indeed, even the Participant communications

---

[22] By way of example, if the Plan invested $100 million in Target Stock during the Class Period and that Stock was artificially inflated by ten percent.  That would be ten million dollars wasted. By contrast, if the Fund went from $2 billion, which included .5% cash, so $10 million in cash and $1.99 billion in Target Stock at the start of the Class Period, to $110 million in cash and $1.9 billion in Target Stock at the end of the Class Period, that would be a buffer of 5.47%, and the Fund would still track Target Stock very closely and the 94.53% of the Fund that consisted of Target Stock would be well within the "primarily" command of the Plan.   Even assuming, *arguendo*, that 5.47% were determined to be too much of a tracking error, there must be some amount greater than 0.5% that would not be too much of a tracking error.  Indeed, at least one court noted that the company stock funds before it "invest almost exclusively in the common stock of the relevant companies, they also contain a small amount (roughly 5% of the overall value of the fund) of cash and other similar highly liquid investments." *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 792-799 (7th Cir. 2011) (reversing and remanding a grant of summary judgment where "the district court made various statements indicating that it thought that Plan fiduciaries had made a reasoned decision to maintain the status quo, [but] it did not cite a document or affidavit, or any deposition testimony, explaining what that decision was, and we have been unable to find anything."  The court remanded for further evaluation of "whether defendants breached the prudent man standard of care ***by failing to make a reasoned decision*** under circumstances in which a prudent fiduciary would have done so[.]") (emphasis added).   The court noted, specifically, that the statement of facts before it "was obviously carefully worded to be consistent with both a deliberate decision to maintain the status quo as well as inertia. Thus, viewing the evidence in the light most favorable to plaintiffs, we must conclude that no Plan fiduciary ever made a decision regarding the solutions to investment and transactional drag that were proposed between 2002 and 2004." *Id.* at 796.  If Defendants had made a reasoned decision, they would not be subject to the same fate.

discussing the Fund's buffer were stamped "CONFIDENTIAL" by Defendants under a protective order pursuant to which the only possible reasons justifying such designation is that Defendants consider it "material not previously disclosed to the public relating to ownership or control of any non-public company" or "proprietary business information or communications, or other confidential research, development, or commercial information or communications[.]"  *See* 0:16-cv-02400-JNE-BRT, Dkt. No. 20.  Since the Fund's buffer was never publicly disclosed, and indeed it appears to have been considered proprietary, there is no reason moderate changes to the buffer would have to be disclosed.

181.   No corrective disclosure would thus be required, and the Fund would continue to track Target Stock closely.  For example, Forms 11-K disclosed that "[t]he fund's objective is to closely track the performance of the Company's common stock."  Participants were similarly advised in SPDs, which are fiduciary communications, that they "own units of a fund that consists primarily of Target Corporation common stock."

182.   Nothing required the Fund to invest exclusively, or practically exclusively, in Target Stock.  While Defendants may contend the Plan was a net seller[23] during part or all of the Class Period, they were under a constant duty to continue monitoring the Fund and its balances.   Once clearly established trends demonstrated, or should have demonstrated, to Defendants that the Fund was a significant net purchaser of Target

---

[23] Publicly available data regarding the Plan's status as a net seller includes pre-Class Period information.  As a result, Plaintiffs are unable to segregate the pre-Class Period data from the Class Period data to confirm whether the Plan was or was not a net seller during the Class Period, or any portion thereof.  It is evident, however, that the Plan did become a significant net-purchaser during the 2014.

Stock, Defendants could not have concluded that freezing purchases would do more harm than good.

183.    Indeed, no harm could be done because: (1) the Fund would comply with all prior disclosures of the Fund "closely tracking" Target Stock and consisting "primarily" of Target Stock; (2) no Participant rights would be impacted, so there would be no blackout and no disclosure was required; (3) insider trading rules would not be implicated because there would be no purchase or sale of a covered security, and; (4) the Fund's liquid holdings would generate short-term interest instead of overpaying for artificially inflated Target Stock.  There is simply no downside to the Plan given the Plan's unique circumstances.  Even if Target Stock rose in price, the Fund would still be "as advertised" and Fund holders would share in that appreciation, to only a slightly lesser degree, but one permitted by the Plan that would not open Defendants to liability.

**Disclosure**

184.    PIC minutes during the relevant time period establish that the Defendants did not disclose, evaluate, or consider the non-disclosure of the material information concerning Target Canada. At no time did Defendants evaluate or consider the impact of the non-disclosures of material information on the existing holdings of the Fund, the prudence of continued purchases of Target Stock at inflated prices, and/or possible market reactions to freezing the Fund or of problems at Target Canada.

185.    Given the significant purchases, and minimal sales, of Target Stock by the Plan and the fact that the Committee was informed of the Plan's net inflows on a daily or near-daily basis, Defendants could not have concluded that ignoring the artificial inflation

in Target Stock was prudent or appropriate. Assuming, *arguendo*, that an ERISA fiduciary can ignore artificial inflation if a Plan is a net seller of company stock, here that would not apply. The Plan, for example, purchased 19.95 times more Target Stock than it sold between January 1, 2014, and April 30, 2014. So even assuming the Plan was receiving more value than it should have for the sales, the Plan's purchases so greatly outweighed sales that prudent fiduciary in the same circumstances could not have viewed freezing the Fund or making a corrective disclosure as more likely to harm the fund than to help it.

186.    Further the Plan allows the Trustee to match sales of Fund units with purchases in the Fund rather than making each individual transaction, so when purchases exceeded sales, the Plan would not have to effectuate any transaction in Target Stock.

187.    Indeed, once the Fund was removed as an investment options, or disclosure was made, Participants would have been prevented from making additional investment in the Fund while Target Stock remained artificially inflated.

188.    While a disclosure might have caused the Fund's value to decrease, the ultimate decline in price would have been no more than the amount by which the price was artificially inflated.

189.    Knowing of the problems at Target Canada and the Plan's transaction pattern, Defendants could not have concluded that stopping purchases or publicly disclosing negative information would do more harm than good to the Fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund.

190.   Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including, but not limited to, disclosing material information or freezing the Fund, which may have reduced the price of Target Stock to its fair market value, and therefore the value of the Plan's assets to its fair market value, the Plan and Participants would have avoided later losses unnecessarily suffered by the disproportionate purchases compared to sales of Target Stock by the Fund. As succinctly stated by the court in an analogous action, "[d]isclosure might not have prevented the Plan from taking a loss on [company] stock it already held; but it would have prevented the Plan from acquiring (through Plaintiffs' uninformed investment decisions and through continued investment of matching contributions) additional shares of overpriced [company] stock: *the longer the fraud continued, the more of the Plan's good money went into a bad investment; and full disclosure would have cut short the period in which the Plan bought at inflated prices.*" *In re Honeywell Int'l ERISA Litig.*, No. 03-1214 (DRD), 2004 U.S. Dist. LEXIS 21585, at \*42-\*43 (D.N.J. Sept. 14, 2004) (emphasis added).

191.   Moreover, disclosure would not have caused a market overreaction because Target is a widely-traded stock on a major stock exchange that is covered by multiple analysts.   Profit seeking arbitrageurs would have act quickly to remove inefficiencies from any market overreaction and bring the price back to fair value.   Defendants could not conclude that any market overreaction to disclosure would be other than temporary while also positing the market was efficient because Target Stock was either efficient or inefficient, but not both at the same time and in the same respect.

192.    As noted above, according to Barclays, Target acknowledged that "its decision to open stores every few weeks was what led to the challenges at Canada."  And its decision to open stores every few weeks was a problem caused by the structure of the initial real estate deal, which forced Target to either generate revenue or face a significant financial drain from holding dormant sites. The net result was to compel the Company to open as many stores as fast as possible, regardless of preparation. These problems were known but not disclosed and contributed to the Target Stock being artificially inflated.

193.    Despite their fiduciary duties, Defendants failed to protect Participants' retirement savings from being imprudently invested in Target Stock and, as a result, the Plan and the Participants suffered substantial losses. A prudent fiduciary facing a similar circumstance would not have stood idly by, as Defendants did, while the Plan spent tens of millions of dollars investing in artificially inflated Target Stock in order to delay the inevitable decline in price of the balance of its holdings.

194.    Defendants should have considered, *inter alia*, that early and candid disclosures would have caused the stock to drop less because disclosure would have mitigated reputational damage to the Company, minimized the risk of nondisclosure claims arising from the Target Canada debacle, and lessened the risk of defending against governmental investigations and paying the associated penalties. *See* Richard A. Booth, Article: *Class Conflict in Securities Fraud Litigation*, 14 U. Pa. J. Bus. L. 701, 708-09 ("holders suffer a further loss because of the expenses suffered by the corporation in defending itself against the class action and any other enforcement proceedings (not to mention possible fines and intangible costs of management distraction)").

89

195.    Defendants should have considered freezing the Fund, and sought counsel as to whether they had to disclose the same and/or freeze sales as well.[24]   To evaluate whether freezing the Fund would have done more harm than good to the Fund, Defendants should have analyzed other companies that have frozen their company stock funds, the disclosures made in connection with the freeze and the resulting price impact of the freeze. Defendants also should have considered that, even given the large amount of Participants' retirement savings invested in the Fund during the Class Period, the average market volume (per Google Finance) of Target stock during the Class Period was over 5.1 million shares per day. Indeed, while the Plan spent $74,056,651 purchasing 1,260,940 shares of Target Stock purchased between January 1, 2014, and April 30, 2014, the average daily volume of Target Stock during that time period was 6,115,127.78 shares, or 4.85 times the Plan's total purchases. Looked at another way, the Plan's transactions represented 1,260,940 of 501,440,478 shares of Target Stock that transacted, or one quarter of one percent of the volume thereof. Put another way, given the relatively small number of Target shares that would not have been purchased by the Fund in comparison to the enormous number of actively traded shares, it is extremely unlikely

---

[24] Even if Defendants had to freeze sales from the Fund, withdrawals in kind, which the Plan allows, are not sales for the purposes of securities laws.  Given the large amount of distributions from the Plan, Plaintiffs believe a significant amount of the losses that would have been incurred by freezing could have been ameliorated by withdrawals in kind, and if Defendants had reviewed the data they would have concluded the same based upon, *inter alia*, the Plan's annual review showing that year-over-year distributions had increased every year since 2009.  Indeed, Participants were advised that upon receiving a lump sum distribution from the Plan, "[y]ou may have the option of receiving your Target Corporation common stock in the form of cash or a stock certificate."

that this decrease in the number of shares purchased, considered alone, would have had a negative impact on the share price, let alone an appreciable impact.

196.   Defendants thus could not have reasonably believed (if they had considered the same, as opposed to ignoring the prudence of Target Stock as a retirement investment) that restricting new purchases of Target Stock by the Fund could have done "more harm than good" to the Plan or the Participants. Indeed, preventing any new purchases of Target Stock by the Fund is not "insider trading" under the federal securities laws because no transaction would occur and no insider benefit would be received. Taking this action would have prevented serious harm to the Plan and would greatly have overshadowed any possible downside therefrom caused by any freezing of the Fund.

197.   Similarly, Defendants thus could not have reasonably believed (if they had considered the same, as opposed to ignoring the prudence of Target Stock as a retirement investment) that disclosure of Target's problems could have done "more harm than good" to the Plan or the Participants. Disclosure would and/or could have: (1) caused the Plan to pay a fair, instead of inflated, amount for the outsized shares it was purchasing, (2) caused the Plan to receive slightly less for the relatively insignificant amount of shares that it was selling, and (3) expedited the inevitable losses by causing Target's Stock price to decrease because of the removal of artificial inflation therefrom. Defendants could not have concluded that there was any way for them to ameliorate such losses without violating insider trading laws. Put simply, given that Target's Stock would fall to its fair value, and given the outsized purchases compared to losses, the Plan's fiduciaries could

not have concluded that allowing artificially inflated purchases of Target Stock might have done more good than harm to the Plan.

198.   Instead of taking (or even considering) a prudent course of action, Defendants allowed Participants who chose to invest their retirement savings in the fund to pay artificially inflated prices for Target Stock during the Class Period well in excess of any artificially inflated benefits received by any Participants who transferred assets out of the Fund. Defendants could not have decided that the 20 to 1 ratio of fund inflows to fund outflows justified allowing the Plan to continue to hold and invest in artificially inflated Target Stock. Instead, Participants who invested in the Fund were damaged by overpaying for Target Stock, and they bore the foreseeable loss which could have been avoided by prudent action by Defendants. No matter what happens to the stock price in the future, these Participants were damaged by paying the excessive artificial price of Target Stock, and so they have fewer shares of Target Stock than they would have had had Target's Stock been trading at a fair price. No matter what the price of Target Stock is at any time in the future, these Participants will bear this loss because they will have fewer shares to sell.

199.   Defendants could have disclosed (or caused others to disclose) the issues plaguing Target's Canada segment so that Target Stock would trade at a fair value. This would have allowed the continued expansion of employee ownership of Company Stock—but at fair value—while also allowing Defendants to comply with their fiduciary duties.  By way of example, the Brief of the Secretary of Labor as *Amicus Curiae in Support of Plaintiff-Appellees* in Whitley v. BP, P.L.C., No. 15-20282, Dkt. No. 70 (5th

Cir. Mar. 11, 2016) (the "DOL *Amicus*"), recognized "one option could be for a plan fiduciary, representing the plan as an investor in company stock, to question the corporate insiders when they participate in investor conference calls." *Id.* at 20 n.4.

200.   Instead of disclosing Target's artificial inflation and complying with securities laws and ERISA, Defendants continued to allow the Plan's damages to increase as the Plan continued purchasing artificially inflated shares on balance while only inevitably delaying a price decline for the shares held. Participants, on balance, were thus harmed by Defendants' inaction. Participants were also deprived of their entitlement to prudent management and whatever the balance of their accounts would have been had their entitlement to prudent management been honored.

### Divert Participant Contributions

201.   Defendants also should have provided that Participant contributions meant to purchase Company Stock be diverted into prudent investment options based upon the Participants' instructions or, if there were no such instructions, the Plan's default investment option.

202.   Neither this action nor the other actions proposed herein would have implicated, let alone been in violation of, federal securities laws or any other laws. Nor would the Plan's ceasing to purchase additional Company Stock likely have sent a negative signal to the market that would be more likely to harm Participants than help them.

**Targeted Letters to Participants re Diversification**

203.    Defendants also could have sent targeted letters to Participants who had not diversified their Company matching contributions, reminding them in a simple and direct manner that they had a right to diversify their Company matching contributions, that they had not done so, and that overconcentration in employer securities is risky.

204.    Instead, Defendants buried such information in 9-point font, 14 pages into a 28 page SPD.  Unlike the short targeted letter proposed by Plaintiffs, the SPD contains large amounts of information regarding various elements related to the Plan.  A short targeted letter would only enunciate the benefits of diversification and the danger of overconcentration in employer securities, and would, in no way, require Defendants to diversify the Fund itself.  Furthermore, such a letter would have done absolutely no harm, but would have done some good—at least some Participants may have evaluated their holdings and/or purchases in the Fund and diverted those holdings and/or purchases to more diversified options.

205.    Indeed, Company match diversification was one of the few relevant data points tracked by the Committee, and the Committee was regularly advised that close to seventy percent of Company matching funds (approximately $35 million-$40 million per quarter) was invested in the Fund instead of being diversified. Nothing prevented the Committee from continuing to remind Participants about their right to diversify and encouraging the same.

## Resign as Plan Fiduciaries

206.    Defendants could have resigned as Plan fiduciaries to the extent they could

not act loyally and prudently.

207.    While resigning as fiduciaries might shift responsibility to other fiduciaries,

Defendants' as fiduciaries *and insiders*, were obliged to do so if they knew Target Stock

was artificially inflated.  While *"most* investors—knowing that they have little hope of

outperforming the market in the long run based solely on their analysis of publicly

available information—will rely on the security's market price as an unbiased assessment

of the security's value in light of all public information[,]" (*Halliburton Co. v. Erica P.*

*John Fund, Inc.*, 134 S. Ct. 2398, 2410-11 (2014) (emphasis in original, citation

omitted)), Defendants were not "most investors" but were, instead, experts with intimate

knowledge and a superior understanding of Target and its problems.  Defendants were

duty-bound by the trust laws that inform ERISA's fiduciary duties,[25] to use their superior

knowledge as fiduciaries to the extent it was legal to do so.[26]

208.    Defendants could not simply rely upon Target Stock's market price if they

knew Target Stock's price exceeded its fair value.  Defendants could not breach their

fiduciary duties because replacement fiduciaries *might* make the same decision they

---

[25] "[A]n ERISA fiduciary's duty is derived from the common law of trusts[.]"  *Tibble v.*
*Edison, Int'l*, 135 S. Ct. 1823, 1828 (2015).

[26] *See* Restatement 2d of Trusts, § 174 ("The trustee is under a duty to the beneficiary in
administering the trust to exercise such care and skill as a man of ordinary prudence
would exercise in dealing with his own property; and *if the trustee has* or procures his
appointment as trustee by representing that he has *greater skill than that of a man of*
*ordinary prudence, he is under a duty to exercise such skill.*")

made.  Replacement fiduciaries might, by contrast, take the resignations as an ominous sign and take action with respect to the Fund, without having inside information, but breaching fiduciary duties because resignation might not effectuate change is contrary to the law of trusts and ERISA.  To the extent Defendants possessed greater skill or knowledge than a man of ordinary prudence, they were simply obliged to use that greater skill or resign from their positions.

209.   Indeed, as discussed above, during the Class Period, Defendants both retained an independent fiduciary to monitor the Fund and changed the Plan's default option so that Participants' earned matching contributions were not invested in the Fund by default. What Defendants could not do was put themselves in a conflicted position by having the Plan hold as much Target Stock as possible to entrench management and provide other benefits to the Company, but ignore the obvious (to Defendants, as a result of their conflicted position) repercussions of purchasing tens of millions of dollars worth of artificially inflated stock on Participants' retirement savings.  Defendants knew that employees are more likely to support management than risk drastic action at a company that might result in layoffs or other drastic changes.

**Sought Guidance**

210.   Further, Defendants also could have sought guidance from the DOL or SEC as to what they should have done, and/or retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Fund.

211.    The DOL has specifically recognized that contacting federal regulators, including the DOL and SEC, is an appropriate response if ERISA fiduciaries believe a company stock fund is artificially inflated.  *See* DOL *Amicus* at n.4.

212.    Moreover, as detailed above, during the Class Period Defendant eventually retained an outside expert to act as independent fiduciary.  Plaintiffs contend that, for the reasons outlined above, Defendants knew or should have known about Target Canada's problems, including those related to distribution channels, artificially inflated Target Stock, and that artificial inflation would eventually be released causing harm to the Fund.

## CLAIMS FOR RELIEF UNDER ERISA

213.    ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan."  29 U.S.C. § 1102(a)(1). Additionally, under ERISA, any person or entity, other than the named fiduciary that in fact performs fiduciary functions for the Plan is also considered a fiduciary of the Plan. A person or entity is considered a plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

214.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

215.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

216.   ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

217.   ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

218.   These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence and are the highest known to the law and entail, among other things:

a.  the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

b.  the duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

c.  the duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

219.   Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

220.   ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of

another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

221.   Plaintiffs therefore bring this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## COUNT I

### Failure To Prudently Manage The Plan's Assets in Violation Of ERISA §§ 404(a)(1)(B) And 405

222.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

223.   This Count alleges fiduciary breaches against the Company Defendant and Committee Defendants (collectively, the "Prudence Defendants") for continuing to allow the investment of the Plan's assets in Target Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because Target Stock was artificially inflated during the Class Period.

224.   At all relevant times, as alleged above, the Prudence Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C.

§ 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan and/or disposition of the Plan's assets.

225. Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. The Prudence Defendants were responsible for ensuring that all investments in Company Stock in the Plan were prudent. The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

226. Defendants failed to engage in a reasoned decision-making process regarding the prudence of Target Stock. An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Target Stock was clearly imprudent while Target Stock was artificially inflated. A prudent fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary losses, and would have made different investment decisions.

227. The Prudence Defendants breached their duties to prudently manage the Plan's assets. During the Class Period, the Prudence Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plan. Yet, during the Class Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect Plan's Participants.

228.   The Prudence Defendants also breached their duty of prudence by failing to provide complete and accurate information regarding Target's true financial condition and, generally, by conveying inaccurate information regarding the Company's Canadian segment. During the Class Period, upon information and belief, Defendants fostered a positive attitude toward Company Stock, and/or allowed Participants to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning the imprudence of investment in Company Stock. As such, Participants could not appreciate the true risks presented by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Fund.

229.   As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning Target's Canadian segment, any generalized warnings of market and diversification risks that Defendants made to Participants regarding the Plan's investment in the Fund did not effectively inform the Participants of the past, immediate, and future dangers of investing in Company Stock.

230.   The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses. The Prudence Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

231.   As a direct and proximate result of the breaches of fiduciary duties during the Class Period alleged herein, the Plan and, indirectly, the Plan's Participants, lost a significant portion of their retirement investments. Had the Prudence Defendants taken

appropriate steps to comply with their fiduciary obligations during the Class Period, Participants could have liquidated some or all of their holdings in Company Stock, and refrained from spending hundreds of millions of dollars on artificially inflated Target Stock, and thereby eliminated, or at least reduced, losses to the Plan and themselves.

232.    Defendants breached their duties of procedural prudence by failing to give appropriate consideration of the facts and circumstances that were relevant to the unrestricted investment in the Fund and by failing to develop an investment policy or strategy that was reasonably designed to further the purposes of the Plan, taking into consideration the excessive risk of substantial losses and the threat to the retirement security of the Participants. The Fund, which was the Plan's largest investment by far, did not have an appropriate benchmark and was not covered by the 2013 IPS or the 2014 IPS. During the Class Period, Defendants, knew or should have known, based upon a proper investigation of the Fund, that investment in the Fund was inappropriate and did not serve the Plan's purpose of helping Participants save for retirement. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Participants, lost a significant portion of their retirement investment.

233.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Breach of Duty of Loyalty in
Violation of ERISA §§ 404(a)(1)(A) And 405**

234.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

235.   This Count alleges fiduciary breaches against the Company, Monitoring Defendants and Committee Defendants (collectively, the "Loyalty Defendants") for continuing to allow the investment of the Plan's assets in Target Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because Target Stock was artificially inflated during the Class Period.

236.   At all relevant times, as alleged above, the Loyalty Defendants were fiduciaries of the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose, and prudence.

237.   ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty; that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

238.   The duty of loyalty includes the duty to speak truthfully to the Plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries. As the Supreme

Court "succinctly explained" in *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996), "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries." *Maez v. Mountain States Tel. and Tel. Inc.*, 54 F.3d 1488, 1499 (10th Cir. 1995) (citing *Varity Corp.*, 516 U.S. at 506).

239. During the Class Period, the Loyalty Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:  failing timely to engage independent fiduciaries who could make independent judgments concerning the Plan's investments in Company Stock during the Class Period; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

240. During the Class Period, certain Defendants, including the Loyalty Defendants, made direct and indirect communications with the Plan's participants in which they omitted or misrepresented information regarding or materially related to investments in Company Stock. These communications included, but were not limited to, conference calls with analysts, SEC filings, annual reports, press releases, and Plan documents (including SPDs). SPDs, which are purely fiduciary communications, "incorporate[d] by reference" Target's filings "pursuant to Section 13(a) or·15(d) of the Exchange Act."  To the extent the Loyalty Defendants knew or should have known any of those filings contained inaccurate portrayals of Target Stock or Target Canada, Defendants breached their fiduciary duty by not correcting such misstatements and instead allowing such statements to be incorporate by reference into fiduciary communications.  Defendants, including the Loyalty Defendants, also acted as fiduciaries

to the extent of this communication activity, and especially to the extent the artificial inflation herein was caused by documents incorporated by reference into, and thus "part [of fiduciary communications] from the date of filing of such reports and documents".

241.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press concerning employees' natural bias toward investing in company stock, including that:

a.  Out of loyalty, employees tend to invest in company stock;

b.  Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

c.  Employees tend not to change their investment option allocations in the plan once made; and

d.  Lower-income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk.

242.    Knowing of these natural biases toward investment of Company Stock, Defendants should have been on high alert to protect the interests of the Participants. Defendants, however, disregarded their duties of loyalty to the benefit of the Company as demonstrated by the Plan's massive holding and purchase of Company Stock.

243.    Further, to the extent that Target satisfied its Plan matching obligations using artificially inflated employer securities which it already held, Defendants, who knew or should have known Target Stock was artificially inflated, participated knowingly

and significantly in deceiving a Participants in order to save the employer money at the Participants' expense, which violates ERISA's duty of loyalty.

244.   The Loyalty Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses. The Loyalty Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

245.   As a consequence of the Loyalty Defendants' breaches of fiduciary duty during the Class Period by putting the interests of themselves and the Company ahead of the Plan and its participants, including the Class Members, the Plan suffered tens of millions of dollars in losses, as its holdings of Company Stock were devastated. If the Loyalty Defendants had discharged their fiduciary duties to loyally manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and, indirectly, Plaintiffs and the other Participants, lost a significant portion of their retirement investments.

246.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

247.   Additionally, the Plan was intended to comply with ERISA section 404(c) ("Section 404(c)") and the Department of Labor's regulations issued thereunder at 29 C.F.R. 2550.404c-1 (the "404(c) Regulations"). Certain defendants retained risks of investment performance, by not complying with the 404(c) Regulations.

248.    ERISA fiduciaries and sponsors generally bear the risk of loss to plan accounts. The ERISA plan fiduciaries are generally liable for all aspects of selection and monitoring of plan investments, and are responsible for any participant claims for fiduciary breaches should something go wrong. "For a non-§ 404(c) plan, the fiduciary's selecting an investment (as provided in § 404(a)(1)(B)) is not only like a fiduciary's selecting an investment option, but also like a participant's investing in an option under § 404(c)." *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 307 n.13 (5th Cir. 2007).

249.    Section 404(c) is a limited exception to this general rule. Section 404(c) provides Plan fiduciaries a "Safe Harbor" from liability for losses that a participant suffers in his or her 401(k) accounts to the extent that the participant exercises control over the assets in his or her 401(k) accounts. S*ee Allison v. Bank One-Denver,* 289 F.3d 1223, 1239 (10th Cir. 2002) (Section 404(c) provides "an escape from liability for fiduciaries in certain instances where a loss results from a participant's exercise of control.").

250.    "If a plan does not qualify as a § 404(c), the fiduciaries retain liability for all investment decisions made, including decisions by the Plan participants." *Tittle v. Enron Corp.* (*In re Enron Corp. Sec. Derivative & ERISA Litig.*), 284 F. Supp. 2d 511, 578 (S.D. Tex. 2003). "Losses that do not 'result from' the participant's exercise of control are still charged against the plan fiduciary[.]" *Id.*

251.    The 404(c) Regulations provide that participants do not exercise "independent control" over investment decisions where a "plan fiduciary has concealed

material non-public facts regarding the investment from the participant."   29 C.F.R. § 2550.404c-1(c)(2)(i)-(iii).

252.   If an ERISA fiduciary "conceal[s] material nonpublic facts", then a court should look to the "facts and circumstances of the particular case" to ascertain whether the fiduciary usurped the plan participant's independent control in the transaction. § 2550.404c-1(c)(2)(ii). *Ruppert v. Principal Life Ins. Co.*, No. 4:07-cv-00344-JAJ-TJS, 2009 U.S. Dist. LEXIS 124387, at *25 (S.D. Iowa Nov. 5, 2009), *reversed on other grounds by Ruppert v. Principal Life Ins. Co.*, 796 F. Supp. 2d 959 (S.D. Iowa 2010).

253.   As shown above, Defendants Target, Steinhafel and Mulligan (the "Concealing Defendants") concealed material non-public facts by misrepresenting the problems at Target Canada, and thus Participants were unable to exercise independent control over their investments and holdings of the Fund.

254.   Accordingly, Section 404(c) does not apply here, and the Concealing Defendants are liable for losses suffered by Participants during the Class Period. As a consequence of Defendants' concealment of material non-public information, the Concealing Defendants retain liability for all investment decisions made, including decisions by the Participants. Pursuant to ERISA §§ 404, 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1104, 1109, 1132(a)(2) and (a)(3), the Concealing Defendants are liable to restore the losses to the Plan for which Participants did not exercise independent control.

## COUNT III

### Failure To Adequately Monitor Other Fiduciaries
### And Provide Them With Accurate Information
### In Violation Of ERISA § 404

255.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

256.   This Count alleges fiduciary breaches against the Company and Monitoring Defendants (collectively, the "Monitoring Defendants").

257.   At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

258.   As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries, namely the Prudence Defendants.

259.   Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

260.   The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a

prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

261.   Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

262.   During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties to the Plan, the Plaintiffs and the other members of the Class by, among other things:

    a.   failing, at least with respect to the Plan's investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

    b.   failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely

impact that financial failure would have on the value of the Plan's investment in Company Stock;

c.  to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in Company Stock; and

d.  failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Class Period.

263.  As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.

264.  The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by those Defendants, and they failed to make any effort to remedy these breaches despite having knowledge of them.

265.  Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Class Period alleged herein, the Plan and,

indirectly, the Plan's Participants and beneficiaries, including Plaintiffs and the other members of the Class, lost tens of millions of dollars of retirement savings.

266.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

267.   The Plan's losses resulting from the Target Canada failure, which devastated the Plan's assets, could have and would have been avoided in whole or in part by Defendants complying with their ERISA-mandated fiduciary duties.

268.   Defendants – who knew or should have known that Target Stock was an imprudent retirement investment – chose to, as fiduciaries, continue allowing the Plan to acquire further Target Stock, while taking no action to protect their wards as the Plan continued to acquire and hold artificially inflated Target Stock. Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plan and its participants.

269.   To the extent Defendants were required to take action based on non-publicly disclosed information that they were privy to, at least the foregoing alternative options – which are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent – were available to Defendants and (a) could have been done without violating securities laws or any other laws, (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA, and (c) would not have been more likely to harm the Plan than to help it.

270.   First, Defendants could have and should have directed that all Company and Participant contributions to the Fund be held in cash rather than be used to purchase Target Stock. The refusal to purchase Company Stock is not a "transaction" within the meaning of insider trading prohibitions. This action would not have required any independent disclosures that could have had a materially adverse effect on the price of Target Stock.

271.   Second, Defendants should have closed the Company Stock Fund to further contributions and directed that contributions be diverted from Company Stock into prudent investment options based upon Participants' instructions or, if there were no such instructions, the Plan's default investment option.

272.   Alternatively, Defendants could have disclosed Target's problems so that the Plan's acquisitions of Target Stock were not receiving a diminished amount of shares as a result of the artificial inflation in Target Stock's price.

273.   As discussed above, the data available to Defendants show that a prudent fiduciary would have concluded that any of the above options, among other possible options, would not do more harm than good to the Fund or the Plan.

274.   Because of Defendants' breaches of duty, the Plan suffered heavy losses during the Class Period because substantial assets of the Plan were imprudently invested, or allowed to be invested, by Defendants in Company Stock, as reflected in the diminished account balances of the Participants.

## REMEDIES FOR BREACHES OF FIDUCIARY DUTY

275.   As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

276.   ERISA § 502(a), 29 U.S.C. § 1132(a), authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan. . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate. . . ."

277.   Plaintiffs, the Plan, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

278.   Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.     Determining that Defendants breached ERISA fiduciary duties to Plan Participants during the Class Period;

C.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

D.     Imposing a Constructive Trust on any amount by which any Defendant was unjustly enriched at the expense of the Plan as a result of breaches of fiduciary duties;

E.     Awarding actual damages in the amount of losses the Plan suffered, to be allocated to the Plan Participants' individual accounts in proportion to the accounts' losses;

F.     Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees and other costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

G.     Awarding equitable restitution and other appropriate equitable monetary relief against Defendants; and

H.     Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY DEMAND**

Plaintiffs hereby respectfully demand a trial by jury for all claims so triable.

Date:  August 30, 2017.

/s/ David E. Krause
David E. Krause (#58117)
**DAVID E. KRAUSE LAW OFFICE, CHTD.**
2716 Colfax Avenue South
Minneapolis, Minnesota 55408
Telephone:  (612) 872-8446
Email:  dkrause@davidkrauselaw.com


**STULL, STULL & BRODY**
Michael J. Klein (*Pro Hac Vice* motion
forthcoming)
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022
Email: mklein@ssbny.com


**LEVI & KORSINSKY LLP**
Nancy Kulesa (*Pro Hac Vice* motion forthcoming)
Michael B. Ershowsky (*Pro Hac Vice* motion
forthcoming)
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: nkulesa@zlk.com


**Attorneys for Plaintiffs**